(No. 76816.

THE CITIZENS UTILITY BOARD, Appellant, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Appellees.

*Opinion filed April 20, 1995.—Rehearing denied May 30, 1995.*

112

HARRISON, J., joined by FREEMAN, J., dissenting.

Wanda K. Zatopa, of Chicago, and Karen L. Lusson, of La Grange, for appellant.

James E. Weging, Special Assistant Attorney General, of Chicago, for appellee Illinois Commerce Commission.

Stephen J. Mattson, Michele Odorizzi and Barbara E. Cohen, of Mayer, Brown & Platt, of Chicago, for appellee Northern Illinois Gas Co.

Eric Bramlet, of Koger & Bramlet, P.C., of Mt. Carmel, for appellee Mt. Carmel Public Utility Co.

David J. Rosso, Boyd J. Springer and Christopher W. Flynn, of Jones, Day, Reavis & Pogue, of Chicago, for appellee Central Illinois Public Service Co.

Eugene H. Bernstein and Jeffrey E. Leeb, of Sidley & Austin, of Chicago, for appellee Commonwealth Edison Co.

Owen E. MacBride and Carrie J. Hightman, of Schiff, Hardin & Waite, of Chicago, and Gary B. Pasek, of Decatur, for appellee Illinois Power Co.

Brent E. Gale, Richard G. Lovig and Cathy S. Wollums, of Davenport, Iowa, for appellee Iowa-Illinois Gas & Electric Co.

David C. Linton, of St. Louis, Missouri, for appellee Union Electric Co.

James Hinchliff and Gerald T. Fox, of Chicago, for appellees The Peoples Gas Light & Coke Co. and North Shore Gas Co.

Edward J. Griffin, of Defrees & Fiske, of Chicago, for appellee Central Illinois Light Co.

JUSTICE MILLER delivered the opinion of the court:

Citizens Utility Board (CUB) appeals from an order of the appellate court, affirming an order of the Illinois Commerce Commission (Commission) in an industry-wide proceeding the Commission initiated on its own motion. The order appealed from addressed the rate-making treatment of expenses Illinois gas and electric utilities will be liable for under existing Federal and State environmental law, particularly the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C. § 9601 *et seq.* (1988)) and similar State environmental legislation (Ill. Rev. Stat. 1991, ch. 111½, par. 1022.2 *et seq.*).

The costs at issue have been or will be incurred to remediate environmental damage, specifically coal-tar residue found at former manufactured gas plant sites. Following lengthy hearings on the nature and treatment of the expenses, the Commission found that Illinois utilities have prudently operated manufactured gas plants (MGP) plants. The Commission also held that utilities could recover the cost of the statutorily mandated coal-tar cleanup expenses from ratepayers. The Commission ruled that the preferable recovery method was by means of a rate mechanism known as a rider. The Commission also ordered utilities to amortize coal-tar cleanup costs over five years, but did not allow utilities to recover carrying charges on the unamortized portion of the costs. Several intervenors in the industry-wide coal-tar case, including CUB, and most of the utilities, petitioned the Commission for rehearing. After the Commission denied all petitions for rehearing, the utilities filed petitions for review in various appellate districts. CUB and the Office of Public Counsel (OPC) also filed an appeal in the Appellate Court, Fourth District. We denied CUB/OPC's motion for a supervisory

order to consolidate the appeals in the Fourth District, but ordered all appeals transferred to the Third District. The appellate court confirmed the Commission's order, with one justice dissenting (255 Ill. App. 3d 876). It is from this order that CUB appeals and the utilities seek cross-relief.

## BACKGROUND

In the late 1800s and early 1900s, many MGPs operated in Illinois to produce gas for Illinois utility customers. Depending on the type of operation, the manufactured gas process produced a variety of waste byproducts, including coal tar. In many cases the coal tar was stored in underground tanks at the MGP site. By the 1950s, the MGP process became obsolete, and MGP operations ceased.

In the 1960s and 1970s, Federal and State governments enacted legislation and established environmental protection agencies (see, *e.g.*, 42 U.S.C. § 7401 *et seq.* (1970) (Clean Air Act); 42 U.S.C. § 6901 (1965) (Solid Waste Disposal Act); 33 U.S.C. § 1251 *et seq.* (1976) (Water Pollution Control Act)) to address environmental concerns. Following passage of the Resource Conservation and Recovery Act (42 U.S.C. § 601 *et seq.* (1988)) and CERCLA (42 U.S.C. § 9601 *et seq.* (1988)), the Federal government accelerated the campaign to clean up hazardous wastes.

CERCLA mandates that responsible parties remediate contaminated sites, and potential liability is broad. (42 U.S.C. § 9601 *et seq.* (1988).) CERCLA imposes liability on current or past owners or operators of a site from which there has been or is a substantial threat of a release of a hazardous substance. Parties who generate wastes that come to be present at a particular site may also be held responsible. (42 U.S.C. § 9607 (1988).) Illinois has enacted legislation imposing similar liability. See Ill. Rev. Stat. 1991, ch. 111$^1$/$_2$, par. 1022.2(f) *et seq.*

Under environmental statutes, gas and electric utilities face potential liability for site cleanup, even where MGP plants were operated with the attendant care and proper procedures of the day. A utility's liability may be based on operation of the MGP by a predecessor utility, ownership of land where a MGP plant operated, or prior operation of a MGP plant. Under Federal and State statute, a utility may be liable for coal-tar cleanup even if the utility no longer owns the MGP site or never operated the plant at the site.

In cooperation with the Illinois Environmental Protection Agency (Agency), utilities began analyzing the extent and cost of MGP site remediation. Evidence suggests that the scope of the problem and the associated cleanup cost each utility will face vary.

As the coal-tar remediation problem became evident, three Illinois utilities sought recovery for expenses associated with coal-tar cleanup through the ratemaking process. *Central Illinois Public Service Co.* (June 12, 1991), ____ Ill. Commerce Comm'n Rep. ____, ICC No. 90—0072 (order on rehearing); *Central Illinois Light Co.* (August 2, 1991), ____ Ill. Commerce Comm'n Rep. ____, ICC No. 90—0127 (order on rehearing); *North Shore Gas Co.* (November 8, 1991), ____ Ill. Commerce Comm'n Rep. ____, ICC No. 91—0010.

While the *Central Illinois Public Service, Central Illinois Light,* and *North Shore* cases were pending, the Commission initiated a generic proceeding to examine coal-tar cleanup issues common to Illinois utilities. The purposes of the generic proceeding were to determine whether utility operation and retirement of MGPs had been prudent; whether prudent cleanup expenditures should be recovered from ratepayers; and, if any portion of the expenses were recoverable, what means should be employed to recoup those costs. The generic proceeding did not evaluate individual companies' cleanup expendi-

tures, but did determine as a preliminary matter how to allocate costs for the cleanup between utilities and ratepayers and how these costs were to be recovered.

Prior to the order in the generic proceeding, the Commission reached conclusions in the company-specific cases. (See *Central Illinois Public Service Co.*, ____ Ill. Commerce Comm'n Rep. ____, ICC No. 90—0072; *Central Illinois Light Co.*, ____ Ill. Commerce Comm'n Rep. ____, ICC No. 90—0127; *North Shore Gas Co.*, ____ Ill. Commerce Comm'n Rep. ____, ICC No. 91—0010.) In each of those cases the Commission found that the remediation costs associated with coal-tar cleanup were completely recoverable from ratepayers. Central Illinois Light Company and North Shore Gas Company were allowed to recover expenses by means of a rider, and Central Illinois Power Company was allowed to include the deferred balance of remediation costs in its rate base.

On September 30, 1992, the Commission issued an order in the generic case. As it had in two of the company-specific cases, the Commission again allowed cost recovery from ratepayers by means of a rider. However, in contrast to the complete recovery allowed in the earlier cases, the Commission concluded in the generic case that the recovery of remediation costs should be amortized over a period of five years. The Commission also ordered that the utilities should not be allowed to recover carrying costs on the unrecovered balance of the expenses.

The Commission denied all parties' petitions for rehearing, and the appellate court confirmed the Commission's order. (255 Ill. App. 3d 876.) The appellate court concluded that the evidence was sufficient to support the Commission's finding that utilities in general had prudently operated and decommissioned MGP plants. The appellate court also found that, given the nature and circumstances of coal-tar remediation ex-

penses, the Commission did not abuse its discretion in holding that a rider is the preferable recovery mechanism. The final issue before the appellate court concerned sharing of the cost of the cleanup between shareholders and ratepayers, which the Commission achieved by denying the utilities recovery of carrying charges during the five-year amortization period. The appellate court held that the Commission's order requiring amortization without recovery of carrying charges was not in error. The appellate court cited the uniqueness of the expenses in question, and the need for the Commission to have some flexibility in fashioning a solution. One justice dissented, on the basis that current customers should not be charged for remediating past practices.

In this appeal, CUB contends that coal-tar remediation costs are not recoverable from current ratepayers. If they are recoverable, CUB argues that the Commission may not use a rider for that purpose. Seeking cross-relief, the utilities cross-challenge the portion of the Commission's order that requires the utilities to amortize coal-tar cleanup costs and denies recovery of interest on the unrecovered portion of the expenses. This appeal involves the Commission's order in the generic coal-tar order, but not the orders in the company-specific cases.

## STANDARD OF REVIEW

The Public Utilities Act (Act) (220 ILCS 5/1—101 *et seq.* (West 1992)) defines the Commission's powers and duties in setting the rates a public utility may charge its customers. Because the Commission is an administrative agency, we will reverse its orders only if the Commission's findings are not supported by substantial evidence based on the record; the Commission acted outside the scope of its statutory authority; the Commission issued findings in violation of the State or Federal Consti-

tution or law; or the proceedings or the manner in which the Commission reached its findings violates the State or Federal Constitution or laws, to the prejudice of the appellant. (220 ILCS 5/10—201(e)(iv)(A) through (e)(iv)(D) (West 1992); see also *United Cities Gas Co. v. Illinois Commerce Comm'n* (1994), 163 Ill. 2d 1.) While the Commission's interpretation of statutory standards is entitled to deference (*United Cities Gas Co. v. Illinois Commerce Comm'n* (1994), 163 Ill. 2d 1), we are not bound by the Commission's interpretation of law (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1992), 148 Ill. 2d 348, 367).

## I. RECOVERY OF CLEANUP EXPENSES

A public utility is entitled to recover in its rates certain operating costs. (*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 200-01.) In setting rates, the Commission must determine that the rates accurately reflect the cost of service delivery and must allow the utility to recover costs prudently and reasonably incurred. (220 ILCS 5/1—102(a)(iv) (West 1992).) In the industrywide coal-tar case, the Commission found that the utilities had operated and decommissioned MGP sites prudently, and CUB does not contest this determination. The reasonableness of any aspect of the total cleanup expense for any specific utility or site is also not at issue in this appeal.

The first question we examine is whether, and to what extent, coal-tar remediation expenses are recoverable from ratepayers. CUB contends that ratepayers are not obligated to bear any coal-tar cleanup expense. CUB relies upon *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1973), 55 Ill. 2d 461, to support its argument that operating costs are recoverable from ratepayers only if the utility demonstrates that the expense provides a direct benefit to customers or to the services supplied to customers. In *Illinois Bell,* this court ad-

dressed a utility's ability to recover certain operating expenses. The *Illinois Bell* court held that licensing fees paid to a parent company could not be recovered from ratepayers absent a showing that the expense directly benefits the ratepayers or the services the utility renders. *Illinois Bell*, 55 Ill. 2d at 483.

Citing the holding in *Illinois Bell*, CUB contends that because the utilities have not proven that coal-tar cleanup costs provide a direct benefit to current utility customers, the cleanup costs are not recoverable. CUB's argument that ratepayers should not pay for any coal-tar remediation costs is also based on the Commission's finding that "any benefit ratepayers receive [from coal-tar cleanup costs] is tenuous, and, at best, can be described as indirect."

We agree with both the Commission and the utilities that neither the holding in *Illinois Bell* nor the Commission's finding that the link between coal-tar cleanup costs and customer benefit is indirect precludes recovery of coal-tar cleanup costs from ratepayers. The *Illinois Bell* court used the concept of benefit to determine how a specific type of operating expense, fees paid to a utility's holding company, should be allocated. *Illinois Bell* did not address a legally mandated cost of business such as coal-tar cleanup expenses, and thus we find that the holding in *Illinois Bell* does not preclude recovery of coal-tar cleanup costs from ratepayers.

However, even if utilities were required to prove that the coal-tar remediation expenses directly benefitted customers, we disagree with CUB's narrow view of what types of costs and expenses benefit customers. As both the Commission and the utilities note, expenses commonly incurred to comply with the mandate of Federal and State law have historically been recoverable from ratepayers. For example, income taxes are a legally mandated cost of doing business and are recover-

able from ratepayers as a component of a utility's revenue requirement. (*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 201.) Taxes are not directly linked to providing a ratepayer with either gas or electric service, but are a necessary expense of utility operations. The payment of taxes can be seen as benefitting the ratepayer, because a public utility must fulfill its tax obligations to remain in business. Similarly, the record in the instant case contains extensive evidence that utilities are required to incur coal-tar cleanup expenses under CERCLA and similar Illinois environmental laws. Coal-tar cleanup expenses benefit a utility's ratepayers because payment of this legally mandated cost allows a utility to remain in business and to continue to provide service to its customers. We agree with the appellate court that MGP remediation costs can be viewed as conferring benefits on utility customers. We do not believe that the Commission exceeded its authority in recognizing coal-tar costs as recoverable from ratepayers.

CUB next claims that the Commission erred in concluding that coal-tar cleanup costs are recoverable from ratepayers because the expenses are historical costs and are unrelated to providing current service. CUB bases its argument on an interpretation of prefatory language in the Act, which states that the Commission should set rates that "accurately reflect the cost of delivering those services" (220 ILCS 5/1—102(a)(iv) (West 1992)). CUB claims this language mandates that utilities recover from ratepayers only those costs which are necessary for providing current service.

We disagree with CUB's interpretation of section 1—102(a)(iv). The Act's prefatory language provides numerous goals and objectives for the Commission, including that the Commission review the connection between rates and the cost of delivering services (220

ILCS 5/1—102(a)(iv) (West 1992)). The cost of delivering utility service reasonably encompasses current costs of doing business, including necessary costs of complying with legally mandated environmental remediation. Thus, we reject CUB's claim that coal-tar costs are not recoverable because they are not directly related to providing current service.

We next address the portion of the Commission's order requiring sharing of the coal-tar remediation expenses between a utility and its ratepayers. In the generic coal-tar case, the Commission found that coal-tar expenses could be recovered from ratepayers, but the Commission also required the utilities to assume some of the costs. To achieve this "sharing," the Commission ordered the utilities to recover the coal-tar costs over five years, and denied the utilities any interest on the unrecovered amounts. The basis for the Commission's determination that sharing was appropriate was the Commission's analysis of the responsibility for the expenses, and the relationship of the expenses to current utility service, as well as consideration of "equitable principles" in the Act.

The utilities contest the Commission's sharing provisions on the ground that amortization without carrying charges denies the utilities complete recovery of the remediation costs from ratepayers. The utilities argue that the Commission had no authority or reasoned basis to deny the utilities recovery of any part of the coal-tar remediation costs and that the appellate court erred in deferring to the Commission's policy choice.

As a preliminary matter, we consider whether the Commission's decision requiring amortization and denying carrying charges is in fact a sharing of costs, resulting in less than full recovery for the utilities. The section of the Commission's order addressing the amortization and carrying charge formula is entitled

"Sharing" and states that "the Commission concludes that neither shareholders nor ratepayers should bear the full burden of such costs." Although the Commission called this arrangement "sharing" in its order, on appeal the Commission argues that it has not ordered sharing, but has allowed the utilities complete recovery of the cleanup costs and has only denied the utilities carrying charges on the unrecovered amount. We believe that the Commission's argument on appeal that its order does not require sharing is without merit. Amortization of the cleanup costs, coupled with denial of interest charges on the unrecovered balance amounts to a discounting. The result is less than full recovery of the coal-tar cleanup expenses for the utilities.

The utilities argue that the Commission is without authority or basis to deny any recovery of coal-tar cleanup expenses because the traditional regulatory model allows total recovery of prudently incurred operating costs. The utilities cite prefatory language in the Act to support their position. (220 ILCS 5/1—102(a)(iv) (West 1992) (a utility should be able "to recover the total costs prudently and reasonably incurred").) The utilities argue that because no showing has been made that the coal-tar cleanup costs were imprudently incurred, they are fully recoverable from ratepayers.

As Commissioner Foran's dissent observed, the record contains evidence that the Commission has traditionally allowed full recovery of statutorily imposed operating expenses, including taxes, safety compliance expenses, and the cost of environmental remediation such as PCB cleanup. However, this past precedent is not controlling, because the Commission is a legislative and not a judicial body, and generally its decisions are not *res judicata* in later proceedings before it. (*Mississippi River Fuel Corp. v. Illinois Commerce Comm'n*

(1953), 1 Ill. 2d 509, 513.) Nonetheless, this court will review the decision to determine if the Commission's decision is supported by substantial evidence based on the entire record. (220 ILCS 5/10—201(e)(iv)(A) (West 1992).) We note that prudently incurred operating expenses have traditionally been recoverable from ratepayers. See *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n* (1953), 414 Ill. 275, 286 (rates fixed by the Commission must be adequate to provide for an adequate rate of return and operating expenses).

Because the Commission's sharing decision does not rest on adequate evidence in the record, we cannot uphold that decision. Although the record contains statements by witnesses advocating only partial recovery of the remediation expenses by the utilities, it contains little evidence to substantiate this position. The witness for the Attorney General advised that the Commission should order sharing simply as a matter of "public policy." The Commission staff witness also recommended sharing, but justified his recommendation on the grounds that coal-tar cleanup expenses did not relate to current service. As we noted earlier, however, we do not believe that lack of a direct connection to current service bars a utility from recovering a mandatory, prudently incurred operating expense from ratepayers.

We believe the language in the preamble to the Act cited by the utilities is also persuasive. The function of a statutory preamble is to supply reasons and explanations for the legislative enactments. (See *Illinois Independent Telephone Association v. Illinois Commerce Comm'n* (1988), 183 Ill. App. 3d 220, 236-37.) The "total cost" language is consistent with this court's holdings in *Illinois Bell*, recognizing the importance of cost recovery as an element of regulatory ratemaking.

The utilities also rely on *Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, to support their claim

that the Commission must allow a regulated entity full recovery of legitimate operating costs. In *Slattery*, the court reversed a Commission order reducing the full recovery of a utility's tax expense. The Commission based its order on the assumption that the utility would successfully litigate and reduce its tax expense liability. The *Slattery* court held that the taxes, imposed under the authority of public law, were fully recoverable. The *Slattery* court held that the Commission could not arbitrarily assume the utility would successfully litigate and reduce its tax expense liability. The utilities contend that *Slattery* holds that a utility may recover from ratepayers all legally mandated operating costs, as a matter of law. Because coal-tar cleanup is mandated under both Federal and State statute, the utilities believe the Commission must allow them to fully recover the remediation expenses.

In its order, the Commission agreed with the utilities' reliance on *Slattery* for the proposition that prudently incurred operating expenses are fully recoverable in rates. However, the Commission then stated that *Slattery* did not support total recovery of coal-tar cleanup expenses from ratepayers because the cleanup costs lack a connection to current service provision. As we have already noted, we do not believe that a prudently incurred operating expense must always have a direct link to current utility service to warrant recovery from ratepayers, and therefore we find no basis for the Commission's departure from *Slattery*.

On appeal, the Commission attempts to justify its departure from traditional treatment of operating expenses by distinguishing the coal-tar cleanup costs from those costs that are completely recoverable. Relying upon the testimony of the Commission staff's witness, the Commission divides expenses incurred by the utility into two categories: current operating costs, which

traditionally are completely recoverable, and costs of doing business, which are not necessarily recoverable from ratepayers. Despite the Commission's distinction, the fact remains that the record in this case demonstrates that the coal-tar cleanup expenses are being incurred in the course of utility operations and are current costs. The Commission's justification for making its distinction rests only on its statement that it "is troubled by charging ratepayers for costs which do not benefit them as utility users, but only as members of the general public." As we noted above, however, these costs are imposed by law on activities and we do not believe that a utility must demonstrate a direct benefit to ratepayers to recover a prudently incurred, mandatory operating cost.

In addition to the arguments contained in its briefs before this court, the Commission set forth grounds for its sharing decision in its generic coal-tar cleanup order. However, we find that the analysis described by the Commission in the order is not sufficiently persuasive to sustain its sharing decision. The first factor the Commission analyzed was the responsibility for coal-tar cleanup in the context of a party's connection to the contaminated land. The Commission concluded that because shareholders stand to benefit once the land is sold, they should bear the cost of risks associated with ownership of the land. However, the record contains ample evidence that coal-tar remediation expenses are statutorily imposed, and are required to maintain or reinstate the property's value. Coal-tar cleanup costs may be likened to operating and maintenance costs incurred to repair land erosion or rotting building materials which are recoverable from ratepayers. The record contains no evidence to suggest that operating and maintenance expenses should be evaluated in the context of the ultimate sale of the land. We note also that the rec-

ord contains evidence that in some cases, Federal and State laws will require utilities to clean up sites that they no longer own, and thus the ownership analysis completely fails in such situations.

In its order, the Commission also stated that it based the sharing decision on the lack of a relationship between the coal-tar cleanup expenses and current utility service. However, this approach conflicts with the Commission's past treatment of mandatory operating expenses such as taxes, which the Commission has always allowed a utility to recover from its customers, regardless of the relationship of the taxes to the provision of current service. Accordingly, this rationale cannot support the Commission's sharing decision for, as we have already stated, a direct connection to current service is not a necessary prerequisite to recovery of an operating expense.

In its order, the Commission also compares coal-tar cleanup costs to expenses that it has previously held must be shared, specifically expenses and costs associated with construction of a cancelled plant. We find that these analogies are distinguishable, and do not support the sharing decision in the present case. Both rate case expenses and cancelled plant construction costs differ in character from coal-tar cleanup expenses. Rate case expenditures and costs associated with cancelled plants involve management choice and discretion whether to incur the expenses. In contrast, coal-tar remediation expenses, as the record clearly states, are imposed on the utility by Federal and State law.

In the order, the Commission did not rest its decision entirely upon analysis of responsibility for the land and connection to the provision of current service. The Commission also considered prefatory language in the Act that states that the goals and objectives of utility regulation should, among other things, ensure "Equity:

the fair treatment of consumers and investors." (220 ILCS 5/1—102(d) (West 1992).) The Commission concluded that this language placed on the Commission the duty of balancing the interests of the ratepayers and the utility.

The Commission's initial analysis, based on land ownership and connection to current service, led it to believe that there was no legal requirement that ratepayers must absorb the coal-tar cleanup expenses. However, the "equity provisions" of the Act led the Commission to believe there was "ample equitable justification" for apportioning the cost between ratepayers and the shareholders.

The utilities argue that the Commission cannot rely upon principles of equity in the Act's preamble to impose sharing. The utilities contend that the Commission has fashioned a subjective notion of equity, allowing it to arbitrarily deny the utilities recovery of traditionally recoverable operating expenses. The utilities further state that the Commission's sharing formula damages the equitable balance of the cost plus rate of return regulatory model. See *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 200 (a public utility is entitled to recover in its rates certain operating costs and earn a return on its rate base).

We agree with the utilities' position. The Commission's reliance on vague "equity principles" is insufficient to sustain the sharing order. The record contains no discussion of the Commission's role in applying "equity" standards, or standards for this principle in regulatory decisionmaking. The record does not contain evidence of the extent of sharing required, or the methodology the Commission employed to determine that the amortization of the cleanup expenses and the denial of carrying costs would properly achieve what it considered to be the correct apportionment of responsibility for the expenses.

Further, the equity language the Commission relies upon is within the preamble to the Act, and is not a part of the substantive law of the Act. (See *Governor's Office of Consumer Services v. Illinois Commerce Comm'n* (1991), 220 Ill. App. 3d 68.) The preamble of the Act contains numerous goals and objectives for utility regulation (220 ILCS 5/1—102 (West 1992)) but it does not confer powers (see *Illinois Independent Telephone Association v. Illinois Commerce Comm'n* (1988), 183 Ill. App. 3d 220, 236-37). Moreover, in its reliance on equity, the Commission overlooks other prefatory language in the Act, such as the goal that regulation ensure efficiency in such a manner that "rates *** accurately reflect the cost of delivering those services and allow utilities to recover the total costs prudently and reasonably incurred" (220 ILCS 5/1—102(a)(iv) (West 1992)), and the goal of environmental quality, which provides that the environment should be protected from the adverse external costs of public utility services so that "the prudently and reasonably incurred costs of environmental controls are recovered" (220 ILCS 5/1—102(b)(ii) (West 1992)). The Commission fails to explain why it selectively relies on considerations of equity to deny partial recovery of coal-tar cleanup expenses, while ignoring the intent of other goals and objectives enumerated in the Act that would suggest that utilities should be allowed to completely recover the expenses from ratepayers.

The Commission noted that costs arising from coal-tar remediation are unique and that as a result the Commission was required to make a "blunt policy decision" regarding the regulatory treatment of these expenses. Generally, the Commission's decisions are entitled to great deference, as being the judgment of a tribunal appointed by law and informed by experience. (*Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n*

(1960), 19 Ill. 2d 436, 442.) However, where the Commission's decisions drastically depart from past practices, they are entitled to less deference. (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 228.) In the company-specific cases the Commission allowed the utilities complete recovery of prudently incurred coal-tar cleanup costs. (*Central Illinois Light Co.,* _____ Ill. Commerce Comm'n Rep. _____, ICC No. 90—0127; *North Shore Gas Co.,* _____ Ill. Commerce Comm'n Rep. _____, ICC No. 91—0010.) In those cases, the Commission specifically rejected proposals that would have amortized costs over a five-year period and denied the companies carrying charges on the unrecovered balances. The Commission argues that it is not bound in the generic coal-tar case by orders it rendered in the earlier company-specific cases because the generic case was initiated on the Commission's own motion to investigate and reach conclusions regarding issues gaining importance in the industry. However, we agree with the utilities that the Commission has failed to articulate a reasoned basis for its sudden departure from the *North Shore* and *Central Illinois Light* orders. Further, and more troubling, without substantial evidence in the record to support its decision, the Commission departs from its longstanding precedent regarding treatment of mandatory operating expenses. In the absence of evidence to support a significant change in treatment of operating expenses, we do not believe that deference is owed to the Commission's policy decision regarding treatment of coal-tar cleanup expenses.

In sum, the decision of the Commission to require utilities to share the statutorily imposed costs of coal-tar remediation was "not supported by substantial evidence based on the entire record of evidence." (220 ILCS 5/10—201(e)(iv)(A) (West 1992).) For the foregoing

reasons, we reverse the judgment of the appellate court regarding the sharing portion of the order, and remand that portion of the order to the Commission to enter an order consistent with this opinion.

## II. RIDER MECHANISM

Although we have determined that this cause must be remanded, we will address here CUB's objections to the rider mechanism the Commission identified as the preferred method for recovering coal-tar cleanup costs. On remand, the Commission may decide to reinstate the rider.

CUB argues that if the coal-tar cleanup expenses are found to be properly recoverable from ratepayers, the Commission erred as a matter of law in allowing the expenses to be recovered through a rider mechanism.

A rider is a cost recovery method. It generally alters an otherwise applicable rate and recovers a specific cost under particular circumstances. (See *A. Finkl & Sons Co. v. Illinois Commerce Comm'n* (1993), 250 Ill. App. 3d 317, 322.) A rider can increase a rate, allowing the utility to recover the cost as it is incurred, alleviating the delay of waiting until the utility files a general rate case to recover expenses. Riders often include a reconciliation formula, designed to match revenue recovery with actual costs. (See *City of Chicago v. Illinois Commerce Comm'n* (1958), 13 Ill. 2d 607, 609.) In the generic coal-tar case, the Commission held it had the authority to approve riders. The Commission found that a rider mechanism was the preferred method for the utilities to use to recoup monies expended to remediate environmental damage at former MGP plant sites. The appellate court agreed that, given the nature of coal-tar cleanup costs, the Commission's preference for recovery by way of a rider was not an abuse of discretion.

CUB claims that it is unlawful to use a rider mechanism to recover coal-tar cleanup costs. In this appeal,

CUB offers four arguments in support of its position that use of a rider is illegal. CUB contends that the Commission lacks statutory authority to allow the utilities to recoup coal-tar remediation by means of a rider. CUB also argues that a rider constitutes single-issue ratemaking, which this court has found illegal. (See *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 244.) Further, CUB contends that the rider mechanism as set out in the Commission's order violates the prohibition against retroactive ratemaking. (See *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195.) Finally, CUB argues that the rider violates the Commission's test-year rules.

The utilities contend that CUB's arguments regarding the Commission's statutory authority and retroactive ratemaking are waived because CUB failed to raise these grounds in its petition for rehearing before the Commission. Further, the utilities argue that a rider mechanism does not constitute single-issue ratemaking or violate the Commission's test-year rules. Should CUB's other arguments not be considered waived, the utilities argue that the Commission has authority to order coal-tar remediation costs recovered by means of a rider and that recovery of these costs by means of a rider does not constitute retroactive ratemaking.

First, we consider the question whether CUB waived its statutory authority or retroactive ratemaking arguments. The Act expressly limits the scope of a party's appeal to the reviewing court to those issues raised in the petition for rehearing before the Commission. 220 ILCS 5/10—113 (West 1992) ("No person or corporation in any appeal shall urge or rely upon any grounds not set forth in such application for a rehearing before the Commission"); *Independent Voters of Illinois v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 100-01; see also

*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 204.

In its application for rehearing before the Commission, CUB argued that the Commission erred in approving a rider as the preferred mechanism to recover the coal-tar cleanup expenses. In support of its position against the rider, CUB raised only the single-issue rate-making argument. However, CUB's application for rehearing incorporated by reference several pages of other pleadings before the Commission in which CUB briefly argued that riders violate the Commission's test-year rules. By its own admission in its brief before this court, CUB did not specifically raise the retroactive rate-making argument in its application for rehearing. Notably, CUB did not incorporate in its petition for rehearing the section of a prior pleading before the Commission that discussed retroactive ratemaking. In support of its position that the issue has been preserved for review, CUB argues that the retroactive ratemaking argument was not waived because it is implicit in CUB's argument that the rider is unlawful. Finally, apart from the generalized contention that the Commission erred as a matter of law in approving the rider mechanism, CUB's petition for rehearing and incorporated references omit any argument challenging the rider as beyond the Commission's statutory authority.

The purpose of requiring issues to be raised in the petition for rehearing is to inform the Commission and opposing parties of alleged legal and factual errors in the Commission's order. (*City of Granite City v. Illinois Commerce Comm'n* (1950), 407 Ill. 245, 250.) In *Granite City*, the appellants claimed in their petition for rehearing before the Commission that the Commission's order was unlawful. Seeking review in the circuit court, the appellant raised the specific argument that the Commission's order could not stand because it changed or

rescinded a previous order without making the narrow finding that the previous order was in error or unreasonable. Although this ground was not raised in the petition for rehearing, the appellant argued that this issue had not been waived, as it was only necessary to make the allegation that the Commission's order was either unreasonable or unlawful. This court found the issue waived, holding that a general allegation could not inform the commission or the opposing party of the specific mistake alleged. *Granite City*, 407 Ill. at 250.

In the instant case, CUB contends that its argument regarding retroactive ratemaking was implicit in the general allegation in its petition for rehearing that the rider is unlawful. We do not agree. Any manner of issues may be implied, but the statutory language specifically requires express mention of grounds for review in the petition for rehearing. (220 ILCS 5/10—113 (West 1992).) CUB's retroactive ratemaking argument was not raised in its petition for rehearing, and thus it is waived. Further, we note that the Commission heard testimony and addressed the parties' arguments regarding its statutory authority to order recovery through a rider mechanism. CUB had ample opportunity to raise its argument regarding statutory authority in its petition for rehearing. Because CUB's petition for rehearing did not argue a lack of statutory authority as grounds for finding the rider illegal, this contention is also waived in the present appeal. We do find, however, that the issues whether a rider violates the prohibition against single-issue ratemaking and test-year principles were properly preserved for review and we now turn to those contentions.

The rule against single-issue ratemaking is a ratemaking principle which recognizes that the revenue formula is designed to determine a utility's revenue requirement based on the utility's aggregate costs and

demand. (*Business & Professional People*, 146 Ill. 2d at 244.) The rule prohibits the Commission from considering changes to components of the revenue requirement in isolation. Consideration of any one item in the revenue formula in isolation risks understatement or overstatement of the revenue requirement. *Business & Professional People*, 146 Ill. 2d at 244-45.

When the Commission examines costs within the framework of a proposed change in base rates, the regulatory principle that prohibits single-issue ratemaking requires the Commission to examine the impact of the expense on the utility's overall revenue requirement. One element of the revenue requirement is the utility's rate of return, or allowed return on investment. Any adjustment to the total investment, or rate base, creates a proportional increase in the return on that investment.

CUB contends that use of a rider to recover coal-tar cleanup costs allows the Commission to approve cost recovery without considering other elements of the revenue requirement formula, ignoring the possibility that a rate increase may not be necessary. In *Business & Professional People*, this court considered, within the context of a traditional rate case, the legality of a utility recovering charges associated with construction of nuclear generating facilities. This court held that the Commission's order allowing the utility to include higher depreciation expense in its rate base, without considering changes in other elements of the revenue requirement formula, was invalid as single-issue ratemaking. *Business & Professional People*, 146 Ill. 2d at 248.

The utilities argue that the principles set forth in *Business & Professional People* regarding single-issue ratemaking do not apply except in the context of a complete base rate proceeding. We agree. In the present case, we are not faced with the Commission's treating a

single-expense item within the context of a general rate case. In contrast, a rider mechanism merely facilitates direct recovery of a particular cost, without direct impact on the utility's rate of return. The prohibition against single-issue ratemaking requires that, in a general base rate proceeding, the Commission must examine all elements of the revenue requirement formula to determine the interaction and overall impact any change will have on the utility's revenue requirement, including its return on investment. The rule does not circumscribe the Commission's ability to approve direct recovery of unique costs through a rider when circumstances warrant such treatment.

In *City of Chicago v. Illinois Commerce Comm'n* (1958), 13 Ill. 2d 607, 610-11, this court highlighted the Commission's discretion in selecting the means by which rates are set and costs are recovered, and the appropriateness of the rider mechanism in certain instances. In *City of Chicago*, intervenors contested the Commission's order approving the utility's tariff revision providing for a rider, or automatic adjustment, to reflect changes in the wholesale cost of natural gas purchased. In approving the rider, this court noted that the Act, taken as a whole, contemplates that the Commission's power is not limited to determining a mere charge or a particular rate; rather, the Commission has the power to change, under certain conditions, any part of a filed schedule rate, rule, or regulation that in any manner affects the rates charged. (*City of Chicago*, 13 Ill. 2d at 614.) This court noted that a rider mechanism is effective and appropriate for cost recovery when a utility is faced with unexpected, volatile, or fluctuating expenses. In the generic coal-tar order at issue in this appeal, the Commission stated that, given the wide variations and the difficulties in forecasting the costs of investigation and remediation activities, riders can gen-

erally be expected to provide a more accurate and efficient means of tracking costs and matching such costs with recoveries than would base rate recovery methods. Numerous witnesses testified to the uncertain and variable nature of the expenses for coal-tar cleanup. We find that the proposed recovery through a rider mechanism, outside the context of a traditional rate proceeding, does not violate the prohibition against single-issue ratemaking.

CUB also claims that a rider violates the Commission's own test-year rules. The utilities and the Commission deny that a rider in this circumstance would conflict with established administrative practices. The appellate court did not directly address test-year principles but found that the rider was lawful in general.

Ratemaking requires the Commission to consider the revenues and expenses of the utility and frequently requires the use of projections or extrapolations from past data. (*Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 213.) To insure accuracy, the Commission has formulated an administrative rule requiring utilities to file rate data in accordance with a proposed one-year test year. (83 Ill. Adm. Code § 285.150 (1985).) The test-year rule is designed to avert mismatching of revenues and expenses that might permit a utility to inaccurately portray a higher need for rate increases. (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 219.) The Commission argues that the test-year rule is merely a uniform filing requirement which standardizes the information utilities submit to the Commission when applying for base rate increases. The Administrative Code states that the standardized filing requirements are intended "to assist the Commission in performing a thorough and expeditious review of filings

for base rate filings." (83 Ill. Adm. Code § 285.110 (1985).) Further, the Administrative Code clearly limits applicability of the filing requirements, including test-year data, to utility company filings that are general rate cases or base rate increases exceeding 1% of jurisdictional revenues. (83 Ill. Adm. Code § 285.130 (1985).) We agree with the Commission and the utilities that the test-year rule seeks to avoid a problem not present when expenses are recovered through a rider. The reconciliation formula used to determine the amount of the rider charge includes a matching of costs incurred with revenue realized. As the Commission notes, the case at bar does not attempt to evaluate or adjust all aspects of the utilities' base rates, and thus the test-year filing is not a prerequisite. We find the Commission's approval of a rider as the preferred mechanism for recovery of coal-tar cleanup costs is within the Commission's authority and not against the manifest weight of the evidence.

For the reasons stated, the judgment of the appellate court confirming the Commission's September 20, 1992, order is affirmed in part and reversed in part, the Commission's order is confirmed in part and set aside in part, and the cause is remanded to the Commission for further proceedings consistent with this opinion.

*Appellate court affirmed in part*
*and reversed in part;*
*Commission decision confirmed in part and*
*set aside in part; cause remanded.*

JUSTICE HARRISON, dissenting:

Under the Public Utilities Act (220 ILCS 5/1—101 *et seq.* (West 1992)), ratepayers are not required to pay any costs incurred by the utility unless those costs directly benefit the ratepayers or the services that the utility renders. (*Illinois Bell Telephone Co. v. Commerce Comm'n* (1973), 55 Ill. 2d 461, 482-83.) The burden of proving such direct benefits is on the utility. (See *Can-*

*dlewick Lake Utilities Co. v. Illinois Commerce Comm'n* (1983), 122 Ill. App. 3d 219, 227.) The affected utilities did not meet that burden here. To the contrary, the record established unequivocally that coal-tar cleanup costs will not yield any benefits to current ratepayers, nor will they in any way enhance the services the utilities provide. Forcing ratepayers to bear costs of that kind violates basic ratemaking principles established by the Public Utilities Act and cannot be permitted. See *A. Finkl & Sons Co. v. Illinois Commerce Comm'n* (1993), 250 Ill. App. 3d 317, 329.

The majority cites *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 201, to support a contrary conclusion, but that case is inapposite. In *Citizens Utilities Co.*, this court observed that Federal income taxes are an operating expense that can be recovered from ratepayers. Although the majority is correct that coal-tar cleanup costs are similar to such taxes in that they are both imposed by the government, there is an important distinction.

Income taxes are directly linked to provision of current utility services. It is the profit earned from the rates charged for current service that generates most of a utility's income tax obligation. By contrast, the obligation to pay coal-tar cleanup costs is wholly independent of the services utilities provide or the fees they charge customers for those services. A utility's responsibility for cleanup costs is based, instead, on whether or not it happens to own or have owned contaminated property. If a utility acquired a contaminated site after a manufactured gas plant ceased operations there, it could still be liable for cleanup costs even though it never utilized the facility itself to provide service to its customers. Thus, liability for cleanup costs is ultimately a function of land ownership, not power production. Accordingly, cleanup expenses can in no sense be considered a cost of operation.

The majority reasons that ratepayers benefit from cleanup costs because compliance with Federal and State environmental laws enables the utility to continue to operate. The implication is that if ratepayers do not bear the expense, their service will be jeopardized. Such a concern is wholly unfounded. There is no reason to believe that ratepayers would be in any real danger of losing their utility service if the shareholders rather than the ratepayers had to bear the cleanup costs.

If anyone in this case benefits from the expenditure of cleanup costs it is the owners of the property, the utilities' shareholders. They profit because, all else being equal, the removal of the hazardous materials will increase the market value of the property. Under the scheme endorsed by the majority today, however, they contribute nothing. It is the ratepayers alone who will be required to finance the costs, and they stand to share in none of the appreciation in value. This may be a lucrative arrangement for those who happen to own utility stock, but it scarcely advances the goal of providing the "least-cost public utility services at prices which accurately reflect the long-term cost of such services and which are equitable to all citizens." 220 ILCS 5/1—102 (West 1992).

The majority's analysis is flawed for another reason as well. Manufactured gas was used because, at the time, it was more efficient to manufacture the product at local facilities than to have natural gas distributed by pipeline. Presumably, this efficiency enabled previous consumers to receive gas supplies at a lower cost than they would otherwise have been required to pay. The tradeoff was that the lower-cost gas generated hazardous waste. Had the hazards been known, the cleanup costs could have been factored into the rates the utilities were allowed to charge so that the rates would accurately reflect the true cost of providing service.

Because the dangers were not known, however, this was not possible. As a result, previous consumers were, in effect, undercharged.

Under the majority's scheme, today's ratepayers are being required to compensate for this miscalculation. The courts of this State have consistently held, however, that where rates, once set, prove to be too low, the shortfall cannot be made up by means of a surcharge (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 243) because such surcharges violate the rule against retroactive ratemaking (*A. Finkl*, 250 Ill. App. 3d at 329). There is no reason to deviate from that position here. To the contrary, the case against retroactive ratemaking is even stronger in the situation before us today. In a conventional surcharge situation, current ratepayers are at least actively benefiting from the lower rates. They are the ones getting the cheaper power. Here, any benefits from the lower rates were enjoyed by ratepayers long past. Current ratepayers receive nothing.

For the foregoing reasons, I would reverse the judgment of the appellate court, set aside the decision of the Commission and remand for entry of an order declaring that coal-tar cleanup costs cannot be passed on to current ratepayers. I therefore dissent.

JUSTICE FREEMAN joins in this dissent.