628 N.W.2d 332 (2001)
2001 SD 63
In the Matter of the ONE-TIME SPECIAL UNDERGROUND ASSESSMENT BY NORTHERN STATES POWER COMPANY IN SIOUX FALLS, South Dakota.
Nos. 21752, 21769.
Supreme Court of South Dakota.
Considered on Briefs an April 24, 2001.
Decided May 23, 2001.
Mark Barnett, Attorney General, Rolayne Ailts Wiest, Special Assistant Attorney General, Pierre, SD, Attorneys for appellant South Dakota Public Utilities Commission.
David A. Gerdes and Neil Fulton of May, Adam, Gerdes and Thompson, Pierre, SD, Attorneys for appellee Northern States Power Company.
SABERS, Justice
[¶ 1.] A Sioux Falls City Ordinance required Northern States Power (NSP) to bury overhead lines whenever streets in the urban renewal area were resurfaced. NSP was allowed by tariff to recover these costs from "benefited customers." In *333 1999, the City resurfaced a street in the urban renewal area and NSP replaced its overhead lines with underground lines. NSP then surcharged all its customers in Sioux Falls a one-time charge of $2.16, reasoning they were "benefited customers." The Public Utilities Commission (PUC) found that NSP erroneously assessed all of its Sioux Falls customers. The circuit court reversed, finding that the aesthetic value of the underground lines "benefited" all Sioux Falls customers of NSP. We reverse the circuit court.

FACTS
[¶ 2.] NSP is an electric utility company that serves approximately 53,000 of a total of 57,000 electric consumers in Sioux Falls. A Sioux Falls city ordinance requires that overhead lines located in an urban renewal area, as designated by the city, be placed underground when affected streets are resurfaced. Ordinance 41-132 provides:
Inasmuch as the underground of overhead lines in the urban renewal area will require a large capital outlay by the affected utility companies, it is reasonable that those utility companies receive at least a partial contribution for their expenses from the benefited customers and inasmuch as the customers must convert or adapt their utility inlets to receive the new underground service, it is necessary to require them to provide at their own expense such new facilities before overhead service is removed. It is hereby declared that, except as otherwise provided by this article, such undergrounding and conversions or adaptations required thereby will be implemented and governed by a written policy prepared by the affected utility company, provided that such a written policy and any amendments thereto be first approved by the city. The written policy, with a resolution attached indicating city approval, will become effective when accepted by the city finance director for filing.
[¶ 3.] In May of 1999, the City informed NSP that Twelfth Street was being resurfaced and that NSP was required to remove the overhead lines and place them underground. NSP complied and placed the lines underground for the two and one half blocks resurfaced along Twelfth Street. The total cost incurred by NSP in complying with the ordinance was $108,299.99.
[¶ 4.] NSP had established a tariff that applied when underground lines were replaced by customer request or lawful order of a municipality.[*] This tariff provided:
The Company will replace its overhead facilities with underground facilities upon the request of a customer, a group of any customers, or upon lawful order of a municipality. The benefited customers will be charged the value of the undepreciated life of the of the overhead facilities being removed and removal costs, less salvage, plus the additional cost, if any, incurred by the Company in installing its underground distribution system including distribution laterals and service laterals, instead of an equivalent overhead system. In addition, payment for each service lateral will be charged in accordance with Section 5.1, STANDARD INSTALLATION. The customer, at his expense, must engage an electrician to convert or adapt his electrical facilities to accept service from the underground facilities to be installed. The Company will not remove its existing overhead service to a customer until after a period of time reasonably adequate for the customer to make the *334 necessary alterations in his electrical facilities to accept underground service.
[¶ 5.] The PUC conducted a hearing to determine whether NSP properly surcharged its Sioux Falls customers as "benefited customers." Jim Wilcox, manager of government and regulatory services for NSP, testified that NSP considered five separate groups as those that "might be available to pay for a project like this." NSP considered the City, the NSP shareholders, three hundred customers in the urban renewal area, the customers who live in the two and one half block area and then all the customers in Sioux Falls. After the City rejected payment, NSP determined that the costs should be allocated among all of its Sioux Falls customers.
[¶ 6.] The reasoning invoked by NSP for this citywide surcharge was that 1.) the city ordinance was passed by the city council which represents the citizens of Sioux Falls; and 2.) all the citizens in Sioux Falls received the aesthetic benefit of having the lines placed underground. In determining benefited customers, the only rationale asserted by NSP before the PUC was aesthetics. The city ordinance did not specify a rationale for the underground lines.
[¶ 7.] The PUC determined that NSP failed to demonstrate that all its Sioux Falls customers were "benefited customers" pursuant to the tariff. The circuit court reversed, finding that it was uncontested that there was a community wide aesthetic benefit from the project and there was no legal requirement that the benefit be unique to NSP's customers or be tangible. PUC appeals.

STANDARD OF REVIEW
[¶ 8.] SDCL 1-26-36 requires this Court to afford "great weight to the findings made and inferences drawn by [the PUC] on questions of fact." It further allows this Court to:
[R]everse or modify [a PUC] decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Clearly erroneous in light of the entire evidence in the record; or
(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Accordingly, we review the administrative agency's decision without regard to the circuit court's decision. In re U.S. West Communications, Inc., 2000 SD 140, ¶ 13, 618 N.W.2d 847, 850 (citation omitted). A tariff has the "force of law" and therefore our review is similar to a statute, de novo. City of Auburn v. Qwest Corp., 247 F.3d 966, 2001 WL 410043, *4 (9th Cir.2001) (interpreting an ambiguous tariff relating to costs for relocating aerial facilities underground.)
[¶ 9.] 1. WHETHER NSP WAS ENTITLED TO SURCHARGE ALL OF ITS SIOUX FALLS CUSTOMERS AS "BENEFITED CUSTOMERS."
[¶ 10.] The circuit court determined that "the only evidence in the record is that all Sioux Falls customers were benefited." The circuit court apparently based this finding on the testimony offered by NSP. Wilcox, an NSP manager, testified that the only feasible group to cover the cost was the Sioux Falls customer base. In addition, Heather Forney, a PUC staff witness, testified that the placement of the lines underground did not *335 improve the safety or reliability of the electrical services. However, she also testified that it increased access to the downtown area, increased safety and improved appearance.
[¶ 11.] Additional testimony was received from NSP customers that they received no benefit or that any benefit NSP attempted to justify was not unique to them as customers. Susan Mantz, an owner of a business directly connected to the new underground lines, stated that she received no benefit to her business as a result of the project. Dan Navin, a Sioux Falls homeowner, pointed out that he received no more benefit because of the underground lines than someone who is not an NSP customer. The PUC agreed with this assessment and found that NSP failed to demonstrate that all of NSP's Sioux Falls customers were "benefited customers."
[¶ 12.] This tariff permits recovery only from "benefited customers." By its terms, NSP was required to demonstrate that the group they wished to surcharge, all of its Sioux Falls customers, were "benefited customers" within the meaning of the tariff. By its plain and everyday usage the term benefit denotes "something that promotes or enhances well being; an advantage." American Heritage Dictionary, 127 (3d ed 1997). If the tariff justifies the imposition of a surcharge based on this tenuous "benefit," it would be a mechanism too easily abused.
[¶ 13.] Contrary to NSP's assertion, this case is distinguishable from a situation where the utility attempts to recover cleanup expenses for environmental remediation from past customer service. See Citizens Utility Board v. Illinois Commerce Commission, 166 Ill.2d 111, 209 Ill. Dec. 641, 651 N.E.2d 1089, 1090 (1995). In that case, the costs were directly related to the past provision of services to customers as a whole. Significantly, that case involved incorporating these costs into the utility's rate structure. Here, we deal with a provision that allows recovery for underground placement costs directly from the benefited customer only. That tariff only allows NSP to recover costs if it can show there were customers who were directly benefited. The tariff refers to "benefited customers" as those who directly connect with the underground service. The language of the tariff limits NSP's ability to recover these costs. The tariff itself refers only to tangible costs and benefits.
[¶ 14.] It is apparent from the record that NSP relied upon who could pay, not who received the benefit. Only after the City refused to pay these costs, and NSP concluded that the costs were too high to pass along to the directly affected customers, did they decide the entire customer base in Sioux Falls was to pay.
[¶ 15.] Clearly, the ability to pay is not the decisive factor in the tariff, the proper standard for taxing these costs is "benefited customer." To recover under the tariff, NSP had the burden of demonstrating all of its Sioux Falls customers were benefited. As this record fails to support NSP's contention that all of its customers in the City of Sioux Falls are "benefited customers," we reverse the circuit court.
[¶ 16.] 2. WHETHER NSP RECEIVED DUE PROCESS THROUGH THE NOTICE OF HEARING ISSUED BY THE PUC.
[¶ 17.] By notice of review, NSP asserts that the notice of hearing did not provide proper notice that the PUC would decide whether NSP was entitled to assess anyone for the cost of the underground project. This argument is without merit.
[¶ 18.] NSP received a notice of a hearing which stated the date and time for *336 hearing, briefly recited the facts surrounding these events, informed NSP the hearing would be an adversary proceeding pursuant to SDCL Chapter 1-26, indicated they had the right to be represented by counsel, testimony and evidence would be presented, and the PUC would then enter findings and conclusions of law. The notice provided: "The issue at the hearing is whether NSP correctly determined who are the benefited customers."
[¶ 19.] SDCL 1-26-17 establishes the requirement for the contents of a notice in a contested case. That statute provides that the notice shall include "a short and plain statement of the matters asserted." "A notice of hearing must fairly apprise a party of the issues so the party can adequately prepare a defense." In the Matter of Bertram, 343 N.W.2d 382, 384 (S.D.1984). The notice received by NSP fairly apprised it of the issue to be decided. The determination made by the PUC was squarely contained within this notice.
[¶ 20.] Reversed.
[¶ 21.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.
NOTES
[*] A tariff sets forth a utility company's rates and practices for service to its customers.