# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People ex rel. Madigan v. Illinois Commerce Comm'n*, 2011 IL App (1st) 101776

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE *ex rel.* LISA MADIGAN, Attorney General of the State of Illinois, Petitioner, v. ILLINOIS COMMERCE COMMISSION, ILLINOIS-AMERICAN WATER COMPANY, CITIZENS UTILITY BOARD, MELODY FLISS, HAROLD C. MENGER, ROSEMARY KATONA, EILEEN and TIM NELSON, THE CITY OF CHAMPAIGN, THE VILLAGE OF PRAIRIE GROVE, THE VILLAGE OF MOUNT PROSPECT, THE VILLAGE OF HOMER GLEN, THE CITY OF DES PLAINES, THE VILLAGE OF TINLEY PARK, THE CITY OF PEORIA, THE CITY OF PEKIN, THE VILLAGE OF BOLINGBROOK, THE ILLINOIS INDUSTRIAL WATER CONSUMERS, THE VILLAGE OF WOODRIDGE, THE VILLAGE OF LEMONT, THE CITY OF ELMHURST, THE CITY OF URBANA, and THE VILLAGE OF ST. JOSEPH, THE VILLAGE OF SAVOY and THE VILLAGE OF SIDNEY, Respondents (Illinois-American Water Company, Cross-Petitioner, v. Illinois Commerce Commission; The People *ex rel.* Lisa Madigan, Attorney General of the State of Illinois; Citizens Utility Board; Melody Fliss; Harold C. Menger; Rosemary Katona; Eileen and Tim Nelson; The City of Champaign; The Village of Prairie Grove; The Village of Mount Prospect; The Village of Homer Glen; The City of Des Plaines; The Village of Tinley Park; The City of Peoria; The City of Pekin; The Village of Bolingbrook; The Illinois Industrial Water Consumers; The Village of Woodridge; The Village of Lemont; The City of Elmhurst; The City of Urbana; The Village of St. Joseph; The Village of Savoy; and The Village of Sidney, Cross-Respondents). |
| District & No. | First District, Fifth Division<br>Docket No. 1-10-1776 |
| Filed | December 9, 2011 |
| Rehearing denied | April 11, 2012 |

| | |
|---|---|
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from an Illinois Commerce Commission decision setting new rates for respondent water company, the appellate court found that the inclusion of a prior rate case expense in the current rate case did not constitute single-issue ratemaking, but the cause was remanded to the Commission for further consideration of the legal and expert fees awarded pursuant to section 9-229 of the Public Utilities Act, since the Commission's order lacked any discussion of the justness and reasonableness of the water company's requested costs, and on the water company's cross-appeal, the appellate court rejected the company's contention that the Commission erred in failing to award the company the full amount requested for its affiliate service company. |
| Decision Under Review | Petition for review of orders of Illinois Commerce Commission, No. 09-0319. |
| Judgment | Affirmed in part and remanded in part. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Carl J. Elitz, Assistant Attorney General, of counsel), for petitioner.<br><br>James E. Weging, Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission.<br><br>John J. Reichart, Albert D. Sturtevant, and Anne M. Zehr, all of Carpenter Lipps & Leland LLP, of Chicago, for respondent Illinois-American Water Company.<br><br>Richard C. Balough and Cheryl Dancey Balough, both of Balough Law Offices, LLC, of Chicago, for respondent Village of Homer Glen.<br><br>Jeffrey M. Alperin, of Tressler LLP, of Chicago, for respondent Village of Bolingbrook. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Justices J. Gordon and Howse concurred in the judgment and opinion. |

**OPINION**

¶ 1     This is an appeal from a decision of the Illinois Commerce Commission (Commission) setting new rates for customers of Illinois-American Water Company (IAWC). Several parties intervened, including the People of the State of Illinois (the Attorney General) and numerous municipalities affected by the proposed increases.

¶ 2     The Attorney General appeals, arguing that (1) the Commission erred in allowing IAWC to include the unamortized portion of $657,530 from a prior rate case expense in its present costs because the inclusion of prior rate case expense violates certain rate setting rules, more specifically, the test-year rule, retroactive ratemaking and single-issue ratemaking; and (2) the Commission failed to properly assess and address IAWC's expenditures for attorney and expert fees in its written order, pursuant to section 9-229 of the Public Utilities Act (220 ILCS 5/9-229 (West 2010)). Additionally, IAWC filed a cross-appeal, arguing that the Commission erred in its findings related to the management fee expense for its affiliate, American Water Works Service Company, Inc. (Service Company), by failing to award the full amount requested and supported by evidence on the record. The Village of Homer Glen and the Village of Bolingbrook submitted response briefs related only to the issue raised in the cross-appeal.

¶ 3     IAWC is a wholly owned subsidiary of American Water and is a public utility that provides water and wastewater distribution service to over 300,000 customers in Illinois. IAWC provides commercial, industrial, fire protection, and sale-for-resale water to numerous communities in various rate areas in Illinois. IAWC also provides public utility wastewater service in the Chicago area. In May 2009, IAWC filed proposed tariffs with the Commission seeking to increase its revenue by approximately $59 million through increases in customers' water and sewer bills.

¶ 4     During the course of the proceedings before the Commission, the parties submitted written direct and responsive testimony, exhibits, and briefs. The Commission held evidentiary hearings in December 2009. In February 2010, the administrative law judge issued a proposed order. In April 2010, the Commission entered its final order and amended order was entered in May 2010. The Commission's decision raised IAWC's revenue by $42 million and set new rates accordingly. We will discuss any additional facts as necessary in the analysis of the issues.

¶ 5     The Attorney General has appealed the Commission's decision. First, the Attorney General argues that the Commission erred in allowing IAWC to recover the $657,530 unamortized portion of the prior rate case expense with the current rate case expense because it violated the test-year rule and constituted retroactive ratemaking and single-issue ratemaking. We will discuss these rate case concepts below.

¶ 6     The setting of utility rates is a legislative function, not judicial, with the Commission acting as the fact-finding body. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (*BPI II*), 146 Ill. 2d 175, 196 (1991). "Administrative regulations have the force and effect of law, are presumed valid, and will be construed under the same standards that apply in construing statutes." *City of Chicago v. Illinois Labor Relations*

*Board, Local Panel*, 396 Ill. App. 3d 61, 73 (2009) (citing *Granite City Division of National Steel Co. v. Illinois Pollution Control Board,* 155 Ill. 2d 149, 162 (1993)). When reviewing an order from the Commission, we give deference to the Commission's decision, in light of its expertise and experience in this area. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009). The Commission's factual findings are to be "considered *prima facie* true; its orders are considered *prima facie* reasonable; and the burden of proof on all issues raised in an appeal is on the appellant." *Commonwealth Edison*, 398 Ill. App. 3d at 514; see also 220 ILCS 5/10-201(d) (West 2010). While we are not bound by the Commission's conclusion on questions of law, we " 'will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute.' " *Commonwealth Edison*, 398 Ill. App. 3d at 514 (quoting *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983)). The Commission's interpretation of "its own standards and regulations is accorded deference as ' "courts appreciate that agencies can make informed judgments upon the issues, based upon their experience and expertise" ' and this policy is consistent with the principle that administrative agencies must have wide latitude to adopt regulations reasonably necessary to effectuate their statutory functions." *City of Chicago*, 396 Ill. App. 3d at 73-74 (quoting *Water Pipe Extension, Bureau of Engineering v. Illinois Local Labor Relations Board*, 252 Ill. App. 3d 932, 936 (1993) (quoting *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 153 (1983))).

¶ 7     "The standard of review, 'which determines the degree of deference given to the agency's decision,' turns on whether the issue presented is a question of fact, a question of law, or a mixed question of law and fact." *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471 (2005) (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001)).

¶ 8     "A mixed question of law and fact asks the legal effect of a given set of facts." *Comprehensive Community*, 216 Ill. 2d at 472. Stated another way, a mixed question is one in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or whether the rule of law as applied to the established facts is or is not violated. *AFM Messenger*, 198 Ill. 2d at 391. A mixed question of law and fact is reviewed under the clearly erroneous standard. *Comprehensive Community*, 216 Ill. 2d at 472.

¶ 9     The clearly erroneous standard of review lies between the manifest weight of the evidence standard and the *de novo* standard, and as such, it grants some deference to the agency's decision. *AFM Messenger*, 198 Ill. 2d at 392. "[W]hen the decision of an administrative agency presents a mixed question of law and fact, the agency decision will be deemed 'clearly erroneous' only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger*, 198 Ill. 2d at 395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). Nonetheless, that the clearly erroneous standard is largely deferential does not mean, however, that a reviewing court must blindly defer to the agency's decision. *AFM Messenger*, 198 Ill. 2d at 395.

¶ 10     Under section 10-201(e)(iv) of the Public Utilities Act, we will reverse the Commission's

order only if: (1) the Commission's findings are not supported by substantial evidence based on the record; (2) the Commission acted outside the scope of its statutory authority; (3) the Commission issued findings in violation of the state or federal constitution or law; (4) or the proceedings or the manner in which the Commission reached its findings violates the state or federal constitution or laws, to the prejudice of the appellant. 220 ILCS 5/10-201(e)(iv) (West 2010); see also *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 120-21 (1995). "Substantial evidence" means more than a "mere scintilla," but it does not have to reach the level of a preponderance of the evidence. *Commonwealth Edison*, 398 Ill. App. 3d at 514. "It is evidence that a 'reasoning mind would accept as sufficient to support a particular conclusion.' " *Commonwealth Edison*, 398 Ill. App. 3d at 514 (quoting *Citizens Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 304 (1997)). "In making adequate findings, the Commission is not required to provide findings on each evidentiary claim; its findings are sufficient if they are specific enough to enable the court to make an informed and intelligent review of its order." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 398 (2010); see also 220 ILCS 5/10-201(e)(iii) (West 2010).

¶ 11     A rate case is started when a utility, such as IAWC, "files tariffs providing for a rate increase and the Commission suspends those tariffs to conduct an investigation and hearing." *Commonwealth Edison*, 405 Ill. App. 3d at 394; see also 220 ILCS 5/9-201 (West 2010). "The Commission may approve, reject, or modify the proposed tariffs. Section 9-201(c) of the Act provides that, "if the Commission initiates a proceeding concerning the appropriateness of a utility's proposed rates, the utility has the burden of proving that the proposed rates are just and reasonable." *Commonwealth Edison*, 405 Ill. App. 3d at 394; see also 220 ILCS 5/9-201(c) (West 2010).

¶ 12     "In establishing the rates that a public utility is permitted to charge its customers, the Commission must first determine the utility's revenue requirement. The components of the revenue requirement have frequently been expressed in the formula 'R (revenue requirement) = C (operating costs) + Ir (invested capital or rate base times rate of return on capital).' " *BPI II*, 146 Ill. 2d at 195-96 (quoting *Citizens Utilities Co. v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 200-01 (1988), citing *City of Charlottesville, Virginia v. Federal Energy Regulatory Comm'n*, 774 F.2d 1205, 1217 (D.C. Cir. 1985)).

¶ 13     Illinois courts have allowed utilities to recover rate case expense because "[t]he costs incurred by a utility to prepare and present a rate case are properly recoverable as an ordinary and reasonable cost of doing business." *Central Illinois Public Service Co.* (*CIPS*) *v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 432 (1993) (citing *Du Page Utility Co. v. Illinois Commerce Comm'n*, 47 Ill. 2d 550 (1971)). IAWC's requested rate case expense included the attorney fees and expenses, the revenue requirement which was comprised of the costs of IAWC, the Service Company and temporary personnel to prepare the rate case, review by a certified public accountant, and the use of a rate of return consultant in preparing the rate case as well as the costs of any studies conducted in support of the rate case. The Attorney General is not challenging IAWC's right to recover the rate case expense incurred in the present rate case, but contends that the Commission erred in allowing IAWC to recover the unamortized portion of the prior rate case expense from Docket No. 07-0507.

¶ 14 In Docket No. 07-0507, the Commission allowed IAWC to recover $1,482,020 in rate case expense. This amount included two studies which were to be amortized over five years, and the remaining $1.3 million cost to litigate the rate case was to be amortized over three years. However, IAWC filed its tariffs for the current rate case before the full amount of the prior rate case expense had been fully amortized and recovered. The unrecovered amount was $657,530. In its order, the Commission allowed IAWC to recover this unamortized rate case expense over a new three-year amortization period, rolled into the same amortization period as the current rate case expense. The Attorney General argues that this action by the Commission violates Illinois law under the test-year rule, constitutes impermissible retroactive ratemaking and violates the concept of single-issue ratemaking.

¶ 15 The Commission asserts that amortization of rate case expense has long been the method allowed for the recovery of such operating expenses of public utilities. See *Du Page Utility*, 47 Ill. 2d at 561 (amortization over a five-year period); *Candlewick Lake Utilities Co. v. Illinois Commerce Comm'n*, 122 Ill. App. 3d 219, 226 (1983) (amortization over two years); *CIPS*, 243 Ill. App. 3d at 432 (amortization over five years). "Because rate case expenses do not routinely occur every year, such expenses are ordinarily amortized over an appropriate period of time." *CIPS*, 243 Ill. App. 3d at 432. As the Commission argues, "if the rate case expense was not to be amortized, then the public utility would recover its rate case expense every 12 months that the new rates were in effect." The time frame of the amortization is an important consideration for the Commission because "if the amortization period is too short, the utility over-recovers its expenses; whereas, if it is too long, the remaining unamortized expenses can be recovered in a subsequent rate case." *Central Illinois Light Co. v. Illinois Commerce Comm'n*, 252 Ill. App. 3d 577, 583 (1993). The recovery of the ratable portion of the prior rate case expense in a subsequent rate case has long been the practice of the Commission. See *Commonwealth Edison Co.*, Ill. Commerce Comm'n, No. 07-0566, at 74 (Sept. 10, 2008) (final order) (finding it was appropriate for utility to recover amortized portion of previously approved rate case expense); *Central Illinois Light Co.*, Ill. Commerce Comm'n, No. 07-0585, at 113 (Sept. 24, 2008) (final order) (rejecting the Attorney General's argument "to totally exclude from rates the unamortized rate case expenses approved in [the utility's] last rate"); *Illinois Power Co.*, Ill. Commerce Comm'n, No. 01-0432, at 27 (Mar. 28, 2002) (final order).

¶ 16 The Commission in *Central Illinois Light Co.* further held:

"Contrary to [the Attorney General and Citizens Utilities Board's] argument, the Commission does not establish a 'normal' level of rate case expenses as it does for other types of cost that are prone to variation over time. Instead, the Commission typically allows a utility to capitalize those costs and amortize them over some reasonable period of time. The [the Attorney General and Citizens Utilities Board's] proposal would deny [the utility] the opportunity to recover reasonable, prudently incurred costs. To the extent [the utility] was authorized to recover rate case expenses in its last rate case and there remain unamortized balances of such authorized costs, [the utility] will be allowed to reflect such costs in rates in this proceeding." *Central Illinois Light Co.*, Ill. Commerce Comm'n, No. 07-0585, at 113.

¶ 17 As previously stated, we give deference to the Commission's interpretation of its own

rules and regulations, based on its experience and expertise in the subject matter. *City of Chicago*, 396 Ill. App. 3d at 73-74. Moreover, "where the Commission's decisions drastically depart from past practices, they are entitled to less deference." *Citizens Utility Board*, 166 Ill. 2d at 132. In *Citizens Utility Board*, the Commission was reviewing the costs involved for coal-tar cleanup costs at gas plants. In this case, the Commission decided that the utilities should share the statutorily imposed cost of the cleanup expenses with the ratepayers by amortizing the costs over five years but excluded recovery of the interest on the unrecovered amount. The supreme court pointed out that in two previous decisions, the Commission had specifically rejected proposals to amortize the costs over five years and to deny carrying costs on the unrecovered balance and instead allowed recovery of all prudently incurred coal-tar cleanup costs. *Citizens Utility Board*, 166 Ill. 2d at 131-32. The supreme court noted that the Commission "failed to articulate a reasoned basis for its sudden departure" from the previous decisions and "without substantial evidence in the record to support its decision, the Commission [departed] from its longstanding precedent regarding treatment of mandatory operating expenses." *Citizens Utility Board*, 166 Ill. 2d at 132. In the absence of evidence to support its policy change, the supreme court concluded that the Commission's decision would be accorded no deference. *Citizens Utility Board*, 166 Ill. 2d at 132.

¶ 18    Here, in contrast, the Commission adhered to its past practice of permitting amortization of the unrecovered prior rate case expense with the current rate case expense. Nevertheless, the Attorney General asserts that this past practice is erroneous and the Commission should not allow IAWC to recover the prior rate case expense because it violates test-year rules and constitutes retroactive ratemaking and single-issue ratemaking.

¶ 19    "In order to accurately determine the utility's revenue requirement, the Commission established filing requirements under which a utility must present its rate data in accordance with a proposed one-year test year. The purpose of the test-year rule is to prevent a utility from overstating its revenue requirement by mismatching low revenue data from one year with high expense data from a different year." *BPI II*, 146 Ill. 2d at 237-38 (citing *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (*BPI I*), 136 Ill. 2d 192, 219 (1989)). According to the Illinois Administrative Code, the test year can be set as either a future or historical year. 83 Ill. Adm. Code 287.20 (2010). Here, IAWC used the 2010 calendar year, ending December 31, 2010, as a future test year. A future test year must be "[a]ny consecutive 12 month period of forecasted data beginning no earlier than the date new tariffs are filed and ending no later than 24 months after the date new tariffs are filed." 83 Ill. Adm. Code 287.20(b) (2010).

¶ 20    The Attorney General argues that allowing the recoupment of unamortized prior rate case expense violates the test-year rule because these costs were not incurred during the test year and it significantly increases the annual rate case expense. The Attorney General asserts that "Illinois law simply does not authorize a utility or the Commission to roll one expense, in this case the rate-case expense, into future test years after the prior rates have been 'permanently canceled and annulled' by the Commission." We note that the Attorney General does not cite any authority to support this statement. According to the Attorney General, prior costs cannot be recovered and the Commission must only consider costs for

the test year.

¶ 21   The Attorney General relies on the testimony of its witness Ralph Smith as support for its argument that the inclusion of the prior rate case expense violates Illinois law and that the amortization approach for recovery should not be followed. According to the Attorney General, the rate case expense should be "normalized" to ensure recovery without overpayment. Smith testified that the normalization approach should be used "prospectively, beginning with the cost for IAWC's current rate case." Smith recommended that the Commission treat the "annual allowance for rate case expense as a normalized amount, rather than an amortization" with the "purpose of the rate case allowance [to] include in rates a representative and normal annual level of reasonably and prudently incurred regulatory expense." Contrary to the Attorney General's argument, Smith did not advocate normalization as the correct way to recover rate case expense, but instead testified that he believed normalization was a better approach to be used prospectively. Regardless, Smith's testimony advocating the normalization of rate case expense did not involve the prior rate case expense, which is the only form of rate case expense being challenged by the Attorney General on appeal.

¶ 22   Moreover, Smith did not testify that the prior rate case expense should be denied for any reason. In fact, Smith recommended that the Commission-approved unamortized amounts "be amortized over the same amortization period that is applied to [IAWC's] expense for the current rate case." Smith then recommended a three-year amortization period for these costs. Further, we point out no witness testified that the inclusion of the prior rate case expense should be denied on any basis.

¶ 23   The Commission and IAWC maintain that the approved prior rate case expense is not outside of the test year because the Commission would not have approved the recovery if it was outside of the test year. The Commission points out that "the approved prior rate case expense is an expense already authorized by the Commission to be collected by the utility from its customers which is within the test year of the newer rate case." Meaning, the amortization period for the prior rate case expense would have included the test year, regardless of the filing of the current rate case.

¶ 24   We agree with the Commission and IAWC. We point out that the amortization of prior rate case expense in a new rate case has been included in the guidelines for a rate case in the Illinois Administrative Code. Section 285.3085(d) states, "If amortization of previous rate case expenses are included within test year jurisdictional operating expense at proposed rates on Schedule C-1, provide the amount of amortization expense associated with each rate case by docket number." 83 Ill. Adm. Code 285.3085(d) (2010). This section lends support to the long-standing practice of the Commission. During the 2010 test year, IAWC was due to receive approximately $471,000[1] of the annual amortization amount approved in the prior rate case. This amount of recovery has been included and reamortized with the current rate case expense. The Attorney General has failed to show how the test-year rule was violated

---

[1]This amount is a portion of the $657,530 unrecovered prior rate case expense with the final portion of the three-year amortized amount and a share of the five-year amortized amount.

when a portion of the prior rate case expense was due to be recovered during the test year. Further, the Commission's long-standing practice of amortization of rate case expense and allowing prior rate case expense in a subsequent rate case is entitled to deference. Given this deference, we see no reason to depart from the Commission's conclusion.

¶ 25       The Attorney General also asserts that the inclusion of the unamortized prior rate case expense in the current rate case constitutes retroactive ratemaking. The supreme court describes the concept of retroactive ratemaking as follows: "Once the Commission establishes rates, the Act does not permit refunds if the established rates are too high, or surcharges if the rates are too low." *BPI II*, 146 Ill. 2d at 243 (citing *BPI I*, 136 Ill. 2d at 209). The rule against retroactive ratemaking is consistent with the prospective nature of the Commission's legislative function in ratemaking and promotes stability in the ratemaking process. *BPI II*, 146 Ill. 2d at 243. A utility is required to charge the rates set by the Commission and penalties may be imposed if a company fails to charge the set rates. *Citizens Utilities Co. v. Illinois Commerce Comm'n*, 124 Ill. 2d 195, 207 (1988).

¶ 26       In *BPI II*, a group of intervenors challenged deferred charges, the costs related to the nuclear electrical generating plants from the date the plants were placed in service to the date of the rate order, as violating the rule against retroactive ratemaking. The intervenors argued that "recovery of deferred charges assesses a current surcharge on ratepayers to compensate [the utility] for the revenues it may have lost during the deferral period." *BPI II*, 146 Ill. 2d at 243. The utility responded that since the Commission had never included the cost of the plants in a valid rate order, the deferred charges were not intended to correct a prior error. *BPI II*, 146 Ill. 2d at 243. The supreme court agreed with the utility and found that "[t]he fact that deferred charges represent capital costs incurred in the past does not make recovery of these costs retroactive." *BPI II*, 146 Ill. 2d at 243-44.

¶ 27       The Attorney General contends that the Commission's order "effectively adds a surcharge" to the new revenue requirement to compensate IAWC for the difference between the rate case expense levels used in the prior rate case and the actual amount recovered by IAWC.

¶ 28       However, as the Commission points out, the Attorney General raised this same argument, that the inclusion of unamortized prior rate case expense in a subsequent rate case constituted retroactive ratemaking, in a different rate case before the Commission and conceded that this was not retroactive ratemaking. In *Commonwealth Edison Co.*, Ill. Commerce Comm'n, No. 07-0566, at 71 (Sept. 10, 2008) (final order), the Commission noted that the Attorney General "conceded that ComEd is not seeking recovery of these expenses as a 'surcharge' because its rates were too low in a prior period."

¶ 29       In *Citizens Utilities*, the utility supplied water and sewer services to Illinois residents. It operated a contract plant, which consists of facilities, such as pumping stations and water mains, that were constructed by a real estate developer and later deeded to the utility in exchange for a regular fee to the developer on the rates charged to the customers. Since the utility acquired the plant at no cost, the contract plant was not included in the rate base for ratemaking purposes. *Citizens Utilities*, 124 Ill. 2d at 201. The issue in this case arose from the different treatment of the contract plant for tax purposes. The utility had included

-9-

depreciation on the contract plant in reducing the amount of federal income tax, but did not depreciate the plant in determining its income tax expense for ratemaking purposes. Thus, the income tax expense was higher than the income tax actually paid to the federal government and the utility used this higher figure to establish rates from 1958 to 1982. *Citizens Utilities*, 124 Ill. 2d at 201-02.

¶ 30     In response, the Commission found that the utility had received a tax benefit in excess of $4.6 million and entered an order reducing the utility's rate base by $4.2 million and reduced the tax depreciation expense for ratemaking purposes by $403,432. *Citizens Utilities*, 124 Ill. 2d at 202. The supreme court found that "the real effect, whether intended or not, of the $4.2 million reduction in Citizens' rate base is to deny retroactively the tax benefits the Commission permitted the company to enjoy during the period from 1958 to 1982," which conflicts with ratemaking principles. *Citizens Utilities*, 124 Ill. 2d at 206-07.

¶ 31     The supreme court concluded that the reduction in the rate base by the Commission constituted retroactive ratemaking because "[t]he tax benefits at issue here originated as expenses that the company was allowed to recover. Just as there is no recovery of reparations for rates charged under a Commission order later held to be invalid, there can be no retroactive adjustment in this case simply because the Commission has now decided to treat the tax benefits differently." *Citizens Utilities*, 124 Ill. 2d at 210-11.

¶ 32     The supreme court in *Citizens Utilities* discussed the decision in *Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.*, 2 Ill. 2d 205 (1954), to illustrate the principle because it was the court's first enunciation of the rule against retroactive ratemaking. In that case, a shipper sought reparations for charges paid under new increased rates set by the Commission that were later set aside by the court. The shipper asked for a reimbursement for payment of the invalid higher rates. The supreme court found that the Commission's approval of the new rates was "legislative in character and prospective in its operation." *Mandel Brothers*, 2 Ill. 2d at 210. The utility is prohibited from charging a rate different than that approved by the Commission. *Mandel Brothers*, 2 Ill. 2d at 210. The court concluded, "It follows that the rate approved by the Commerce Commission as just and reasonable was the rate which the utility was required to charge so long as the order of the commission remained in effect. It cannot therefore be said that in charging that rate the utility charged an excessive rate which gave rise to a claim for reparations." *Mandel Brothers*, 2 Ill. 2d at 211-12.

¶ 33     Here, the prior rate case expense was approved by the Commission and the recovery of the expense was amortized prospectively over three years, but the current rate case was filed before the recovery period had been completed. The inclusion of the previously approved rate case expense in the current rate case has not created a surcharge to compensate for low rates. This rate case expense was already approved by the Commission and not added retroactively to cure a mistake. Accordingly, we find that the Commission's inclusion of the unamortized prior rate case expense in the current rate case expense amortization period does not constitute retroactive ratemaking.

¶ 34     The Attorney General further argues that the Commission's order constitutes single-issue ratemaking. The supreme court in *BPI II* explained single-issue ratemaking.

    "The rule against single-issue ratemaking recognizes that the revenue formula is

designed to determine the revenue requirement based on the *aggregate* costs and demand of the utility. Therefore, it would be improper to consider changes to components of the revenue requirement in isolation. Often times a change in one item of the revenue formula is offset by a corresponding change in another component of the formula. For example, an increase in depreciation expense attributable to a new plant *may* be offset by a decrease in the cost of labor due to increased productivity, or by increased demand for electricity. (Demand for electricity affects the revenue requirement indirectly. The yearly revenue requirement is divided by the expected demand for electricity to arrive at a per kilowatt hour rate. If actual demand is more than the estimated demand used in the formula, the utility's revenues increase.) In such a case, the revenue requirement would be overstated if rates were increased based solely on the higher depreciation expense without first considering changes to other elements of the revenue formula. Conversely the revenue requirement would be understated if rates were reduced based on the higher demand data without considering the effects of higher expenses." (Emphasis in original.) *BPI II*, 146 Ill. 2d at 244-45.

"If rates are increased based solely on one factor, the ratemaking structure becomes distorted because there is no consideration of the changes to the other elements of the revenue formula, such as the operational savings from the improvements." *Commonwealth Edison*, 405 Ill. App. 3d at 410 (citing *BPI II*, 146 Ill. 2d at 244).

¶ 35 In *BPI II*, the intervenors argued that the recovery of the deferred charges constituted single-issue ratemaking because deferred charges measure only selected elements of the revenue formula. The supreme court agreed with the intervenors that "as the record now stands, recovery of the full amount of deferred charges constitutes single-issue ratemaking," but limited the issue to "the amount of charges which [the utility] may recover, rather than to whether recovery of any deferred charges is permissible." *BPI II*, 146 Ill. 2d at 245. The supreme court agreed with the intervenors' assertion that most of the increased expenses of the deferred charges would have been offset by decreases in other operating expenses as well as higher revenue from the increased demand, but compensating the utility for the higher depreciation expenses without considering other changes in the revenue requirement constituted single-issue ratemaking. *BPI II*, 146 Ill. 2d at 245.

¶ 36 Here, the Attorney General contends that the Commission allowed IAWC to isolate the rate case expense and to carry over part of that expense into the new rates. According to the Attorney General, this was error because once the Commission cancels the prior rates, IAWC's costs built into those rates must be abandoned. The Commission responds that it considered all of IAWC's costs, other expenses, the rate base and return on investment, including the unamortized portion of the prior rate case expense, during the test year in establishing the new rates. The Commission asserts that the Attorney General's argument views the prior rate case expense in isolation, not part of the aggregate of all of IAWC's expenses.

¶ 37 We agree with the Commission. While the Attorney General argues that the prior rate case expense was considered in isolation, the prior rate case expense was only one small portion of the entire rate case. The Commission did not raise the rates based solely on IAWC's request to recover prior rate case expense. The Commission's order considered

-11-

IAWC's entire rate structure, including the rate base, operating expenses and revenues, cost of capital and rate of return, cost of service, and rate design. Contrary to the Attorney General's position, the Commission did not base the rate increase on one factor, *i.e.*, the prior rate case expense, but instead weighed the aggregate costs for IAWC. Accordingly, we find that the inclusion of prior rate case expense in the current rate case did not constitute single-issue ratemaking.

¶ 38    Next, the Attorney General contends that the Commission did not comply with section 9-229 of the Public Utilities Act because its order failed to "specifically assess the justness and reasonableness" of IAWC's requested attorney and expert fees and to "expressly address" its findings in its order. The Commission and IAWC maintain that the Commission fully complied with section 9-229.

¶ 39    Generally, the Commission is not required to cite evidence in its findings, but instead "must make findings in support of its decision, and support for the findings must exist in the record." *Commonwealth Edison*, 398 Ill. App. 3d at 518. Section 10-201(e)(iii) only requires findings "sufficient to allow an informed judicial review." 220 ILCS 5/10-201(e)(iii) (West 2010).

¶ 40    However, the General Assembly enacted section 9-229, effective July 1, 2009, which provides:

> "Consideration of attorney and expert compensation as an expense. The Commission shall specifically assess the justness and reasonableness of any amount expended by a public utility to compensate attorneys or technical experts to prepare and litigate a general rate case filing. This issue shall be expressly addressed in the Commission's final order." 220 ILCS 5/9-229 (West 2010).

¶ 41    In its order, the Commission summarized the arguments from the parties on this issue. IAWC requested a rate case expense of $2,339,496, which included $930,000 in legal fees and expenses. The Attorney General argued that the figure for legal fees and expenses was unreasonable and noted that this amount is an increase of 43% over the legal fees requested in the prior rate case, but IAWC offered no reason for the increase from the prior rate case. The Attorney General recommended that the Commission should limit the attorney fees and expenses to the same amount approved in the prior rate case, $650,000, or an increase of 10%. The Attorney General also took issue with a request of $422,900 for the cost of an expert-prepared study, the Service Company Study. The Attorney General did not believe that the study justified the recovery from the taxpayers and should have been disallowed.

¶ 42    IAWC responded that the Attorney General only considered IAWC's estimate of costs from the prior rate case, but the actual costs incurred were more than those requested in the current rate case. IAWC also noted that the Attorney General ignored the extensive cost-control measures that had been implemented by IAWC, such as fixed fees and agreements for "not-to-exceed" amounts, and the requested rate case expense was a reasonable and accurate projection of the necessary costs to prosecute the current rate case. The Commission staff recommended that the Commission find the expenses to be just and reasonable. The order noted that the staff witness attached two of IAWC's responses to requests used to provide a basis for the proposed expenditures. After summarizing all of the parties' positions,

the Commission allowed IAWC's requested costs.

"Regarding other rate case expenses, including legal expenses, the Commission agrees with the conclusion of Staff [Commission Staff], which entered into evidence numerous data request responses it reviewed in its assessment of fees to attorneys and technical experts, that [IAWC's] rate case expenses are just and reasonable within the meaning of Section 9-229 of the Act, 220 ILCS 5/9-229. The record shows that the services were reasonably necessary in the preparation and presentation of the case, and that [IAWC] undertook reasonable measures to control the costs. Thus, while lowering rate case expenses is a desirable goal, the record supports the inclusion, rather than disallowance, of the expenses proposed by IAWC."

¶ 43    The Attorney General asserts that section 9-229 reflects the General Assembly's concern that the legal and technical expert fees included in utility rates needed closer review and the Commission's order should provide a basis for allowing such charges. The Attorney General notes that the two responses for data requests are each a single-page spreadsheet listing costs incurred in eight categories. One response was as of June 30, 2009, and the other was an updated cost estimate as of August 31, 2009. Neither of these data responses itemized the costs of the individual categories. The legal fees and expenses was one aggregate figure with no detail of the incurred costs. In data request number ICC LHW 5.01, when asked if the amount requested was a just and reasonable request, Tyler Bernsen, a financial analyst on behalf of IAWC, responded that the amount of legal fees was "reasonable because it [was] based on a projection of legal fees and expense for this rate case by [IAWC's] legal service providers that reflects those providers' past experience representing Illinois water utilities in rate proceedings." The response further noted the attorneys' experience and stated that the rates were consistent with or below market rates and the attorney fees included "not-to-exceed" amounts. The response pointed out that the amount requested was less than what was actually incurred in the prior rate case.

¶ 44    In document request number ICC LHW 3.04, IAWC provided a legal fee projection. This projection listed the attorney fees for fixed and hourly rates for the general rate increase as from two providers, Jones Day and Boyd Springer, each with a "not-to-exceed" amount listed ($619,000 and $261,000, respectively). The next section outlined legal costs associated with two studies. The costs were listed by an attorney for a number of hours at a set rate. The type of work performed to reach the hours expended or the reason for the hourly rate was not explained. The total of the legal expense projected was $930,000.

¶ 45    The Commission responds that section 9-229 did not change the existing practice of determining whether the legal and expert fees were just and reasonable. The Commission maintains that its construction of the statute is proper and does not require any additional findings or discussion in order to "expressly address" these fees. IAWC also asserts that the Commission complied with section 9-229 by outlining all of the parties' positions on the issue and then concluding that the projected amounts expended by IAWC were just and reasonable.

¶ 46    The cardinal rule in construing a statute, to which all others are subordinate, is to ascertain and give effect to the intent of the legislature. *Alvarez v. Pappas*, 229 Ill. 2d 217,

228 (2008). To determine legislative intent, we turn to the language of the statute, which is the best indicator of its intent. *Alvarez*, 229 Ill. 2d at 228.

¶ 47 In considering section 9-229, we note that prior to its enactment, the Commission, pursuant to section 10-201(e)(iii), only needed to make sufficient findings to allow for informed judicial review. Section 9-229 created a requirement for more specific findings. Under section 9-229, the Commission is required to "specifically assess the justness and reasonableness" of "any amount" paid by the utility for legal and expert fees and the Commission must "expressly address" this issue in its order. 220 ILCS 5/9-229 (West 2010). We construe this statutory language to require the Commission to "expressly address" the basis for its findings. Section 9-229 mandates a more detailed finding than what is generally required of the Commission, otherwise the purpose of the legislative action to enact it was unnecessary.

¶ 48 While the Commission referenced this statute in finding that the IAWC's request for attorney and expert fees was just and reasonable, the order failed to explain the basis for such a finding. Though the Commission thoroughly outlined the parties' positions as to the legal and expert fees, its own finding lacked any explanation or discussion. The documents submitted by IAWC to support its requested legal fees did not detail what tasks were performed by which attorney. Rather, it listed either the "not-to-exceed" amounts or a generic line item of the number of hours spent on the case and the attorney's rate.

¶ 49 The Commission agreed with its staff's conclusion, noting that it entered into evidence numerous data request responses reviewed in the staff's assessment. However, the Commission does not describe what these data request responses stated. In its summary of the staff's position, the Commission only noted two data request responses, which simply listed the full amount of costs incurred without any breakdown or detail to show how that amount was reached. The Commission concluded the expenses were just and reasonable because the services were "reasonably necessary in the preparation and presentation of the case, that [IAWC] undertook reasonable measures to control costs." Apart from these conclusions, the Commission's order lacks any discussion of the justness and reasonableness of IAWC's requested costs.

¶ 50 Under our interpretation of section 9-229, the Commission's conclusion lacked sufficient detail to comply with the statute. Accordingly, we remand the order to the Commission for additional findings on the issue of legal and expert fees as required under section 9-229 of the Public Utilities Act.

¶ 51 While we make no finding as to the amount of attorney and expert fees requested, we point the Commission to other cases involving an award of attorney fees, in which the party seeking attorney fees must specify (1) the services performed, (2) by whom they were performed, (3) the time expended, and (4) the hourly rate charged. *Fitzgerald v. Lake Shore Animal Hospital, Inc.*, 183 Ill. App. 3d 655, 661 (1989) (citing *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 984 (1987)).

> "Once presented with these facts, the trial court should consider a variety of additional factors such as the skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issues and work involved, the importance of the

matter, the degree of responsibility required, the usual and customary charges for comparable services, the benefit to the client [citation], and whether there is a reasonable connection between the fees and the amount involved in the litigation [citations]." *Kaiser*, 164 Ill. App. 3d at 984.

¶ 52 Similar to cases before the trial court, the Commission has the ability to consider the factors presented to establish the amount of attorney fees requested. We believe that these cases regarding an award of attorney fees can provide guidance to the Commission and the parties to comply with section 9-229.

¶ 53 We now consider the issue raised by IAWC in its cross-appeal.

¶ 54 Initially, the Commission contends that this court lacks jurisdiction to consider IAWC's cross-appeal. The Commission argues that IAWC's cross-appeal was untimely pursuant to section 10-201(a) of the Public Utilities Act (220 ILCS 5/10-201(a) (West 2010)). Section 10-201(a) provides that a party may appeal from an order of the Commission to the appellate court within 35 days of the order or decision of the Commission refusing an application for rehearing. 220 ILCS 5/10-201(a) (West 2010). The Commission states that it denied the application for rehearing for IAWC and other parties on June 2, 2010, and the notice of the action was served on IAWC on June 3, 2010. Under section 10-201, IAWC's petition for review was due on July 1, 2010, but IAWC filed its cross-appeal petition for review on July 12, 2010. According to the Commission, this filing was untimely. The Attorney General agrees with the Commission's argument that we have no jurisdiction to consider the cross-appeal.

¶ 55 IAWC maintains that this court has jurisdiction over its cross-appeal. Supreme Court Rule 335 provides the procedure for a statutory direct review of orders of an administrative agency to the appellate court. Ill. S. Ct. R. 335 (eff. Feb. 1, 1994). Rule 335(i)(1) states that "[i]nsofar as appropriate, the provisions of Rules 301 through 373 (except for Rule 326) are applicable to proceedings under this rule." Ill. S. Ct. R. 335(i)(1). IAWC asserts that it filed its cross-appeal in compliance with Supreme Court Rule 303(a)(3), which is applicable to administrative appeals as stated in Rule 335.

¶ 56 Rule 303(a)(3) states:

"If a timely notice of appeal is filed and served by a party, any other party, within 10 days after service upon him or her, or within 30 days from the entry of the judgment or order being appealed, or within 30 days of the entry of the order disposing of the last pending postjudgment motion, whichever is later, may join in the appeal, appeal separately, or cross-appeal by filing a notice of appeal, indicating which type of appeal is being taken." Ill. S. Ct. R. 303(a)(3) (eff. June 4, 2008).

¶ 57 The Attorney General filed its notice of appeal with the Commission and a petition for review in this court on June 30, 2010. IAWC states that it was served with notice the Attorney General's appeal on July 4, 2010, and filed its notice of appeal with the Commission and a petition for review in this court on July 12, 2010. IAWC asserts that its cross-appeal was timely under Rule 303(a)(3). The Commission contends that Rule 303(a)(3) is "inappropriate to extend the time for taking direct administrative appeals."

¶ 58 Even though section 10-201(a) is silent as to the procedure and time frame for filing

cross-appeals, the Commission asks this court to find that the 35-day time period for filing direct review of an order of the Commission controls, regardless of whether the party is filing an appeal or cross-appeal. We decline to do so.

¶ 59    The supreme court in *County of Cook, Cermak Health Services v. Illinois State Local Labor Relations Board* held:

> "We stress that the legislature has the power under article VI, section 6, of the constitution to provide for direct appellate review of administrative actions. The use of such legislative authority must be explicitly stated, however, or when statutory requirements enacted pursuant to the legislature's constitutional power under article VI, section 6, are in conflict with this court's rules, our rules will control." *County of Cook, Cermak Health Services v. Illinois State Local Labor Relations Board*, 144 Ill. 2d 326, 334-35 (1991).

¶ 60    In *Cermak Health Services*, the appellant filed its petition for review in the appellate court 32 days after the Labor Relations Board issued its decision, citing section 3-103 of the Administrative Review Law (Ill. Rev. Stat. 1987, ch. 110, ¶ 3-103 (now see 735 ILCS 5/3-103 (West 2010))), which allowed for review to be filed with 35 days of an agency's order. The supreme court held that section 3-103 applied to review in the circuit court, not to the direct appellate court review. *Cermak Health Services*, 144 Ill. 2d at 331. The supreme court held that Rule 303(a) applied to the filing of a direct review in the appellate court. The court noted that the legislature "could have explicitly imposed a 35-day appeal period if that had been its intent, but it did not do so in the Labor Relations Act," but it did explicitly state the period to seek appellate review in the acts governing other administrative agencies, including the Public Utilities Act (Ill. Rev. Stat. 1987, ch. 111 2/3, ¶ 10-201 (now see 220 ILCS 5/1-101 *et seq.* (West 2010))). *Cermak Health Services*, 144 Ill. 2d at 334.

¶ 61    In *City of Chicago v. Human Rights Comm'n,* the reviewing court considered whether it retained jurisdiction over a cross-appeal after the direct appeal was dismissed. In that case, the direct appeal was filed pursuant to section 8-111 of the Illinois Human Rights Act (775 ILCS 5/8-111 (West 1992)), which like section 10-201(a), allowed the filing of an appeal within 35 days, but the cross-appeal was filed pursuant to Rule 303(a)(3). *City of Chicago v. Human Rights Comm'n*, 264 Ill. App. 3d 982 (1994). The appellate court found that the cross-appeal was properly filed within 10 days of the notice of appeal and the court's jurisdiction vested at that time. *City of Chicago*, 264 Ill. App. 3d at 986. The reviewing court concluded that the cross-appeal was timely filed and the fact that the appellant moved to dismiss its appeal had no bearing on the jurisdiction of the cross-appeal. *City of Chicago*, 264 Ill. App. 3d at 987; see also *People ex rel. Madigan v. Illinois Commerce Comm'n*, 407 Ill. App. 3d 207, 218 (2010) (finding Rule 303(a)(2) applicable for the filing of petition of review of a Commission decision).

¶ 62    Here, section 10-201 contains no explicit direction as to the filing of a cross-appeal, but Rule 303(a)(3) does. The Commission does not dispute that IAWC's cross-appeal was timely under Rule 303(a)(3). As the supreme court held in *Cermak Health Services*, the use of legislative authority must be explicitly stated. Section 10-201 is silent as to cross-appeals and we decline to read an additional time limit into the statute. As the court in *City of Chicago*

found, a cross-appeal from an administrative decision is timely filed within 10 days of the notice of appeal, pursuant to Rule 303(a)(3). Since IAWC filed its cross-appeal within 10 days after the notice of appeal was filed, this court has jurisdiction to consider IAWC's cross-appeal.

¶ 63 In its cross-appeal, IAWC argues that the Commission's findings related to the IAWC's Service Company fees are not supported by the evidence. IAWC requested $21.167 million for Service Company fees, which represented a 22.5% increase from the amount requested in the prior rate case. The Commission denied the full request; instead, the Commission capped the Service Company fees at 5% over the amount approved in the prior rate case and allowed $18.114 million in Service Company fees. IAWC contends that the Commission unlawfully reduced the test-year level Service Company fees by $2.5 million.

¶ 64 The Commission responds that the IAWC failed to comply with a requirement set forth in the prior rate case that IAWC conduct a study to determine whether the services provided by the Service Company were reasonable in cost. In its order, the Commission quoted portions of the order in the prior rate case, Docket No. 07-0507, relating to fees for the Service Company.

" 'The Commission points out that it does question whether IAWC is doing everything possible to be efficient in controlling its management fees to avoid passing unnecessary costs to ratepayers. Although the Commission holds that the expense requested is not unreasonable, it does so only in the absence of specific and adequately justified adjustments.'

The Order further stated that:

'Because the Commission questions whether IAWC is doing everything possible to ensure low costs for ratepayers, the Commission directs IAWC to conduct a study comparing the cost of each service obtained from the Service Company to the costs of such services had they been obtained through competitive bidding on the open market. As part of the study, IAWC must also provide an analysis of the services provided by the Service Company to all of IAWC's affiliates. The analysis must provide details on the specific services provided to IAWC and how costs are allocated among affiliates of IAWC. IAWC shall include the study in its next rate filing.' "

¶ 65 In accordance with this mandate from the Commission, IAWC prepared three studies, which were presented with the current rate case. The first study was entitled the "Service Company Cost Study" (cost study) and was prepared by Deloitte & Touche. The cost study compared "the cost of services expected to be obtained by IAWC from [Service Company] to the costs that would be incurred if such services were obtained in the open market." The study considered the market service cost of the following categories: accounting services, engineering services, information technology services, legal services, and management consulting services. Deloitte & Touche "obtained the service classifications and market rates used to calculate the weighted average hourly billing rates for each of the five service categories." "The market surveys contain information relating to the compensation, fee and billing practices for the five categories of professional services firms." Based on the survey information, Deloitte & Touche concluded that the surveys provided a reliable indication of

market price for the service categories. The cost study provided a comparison of the Service Company costs to the expected market price by setting out the Service Company hourly rates with the market rates. The cost study showed the Service Company to have a lower hourly rate in each of the five service categories, ranging from $29 per hour below market rate to $113 per hour below market rate. The cost study concluded that IAWC saved approximately $7.27 million per year by using the Service Company rather than other providers at market rates.

¶ 66       The second study presented was the "Self-Provision Study," which compared the Service Company cost for those services to the cost that IAWC would incur to retain additional employees to provide each service. IAWC's president Karla Teasley testified that the Self-Provision Study concluded that IAWC would be required to hire 182.5 additional employees on a full-time basis at an increased cost of $5.5 million. IAWC would also incur additional one-time costs for the hiring of new employees, training and orientation, and relocation costs. The Self-Provision Study also compared the cost to IAWC to obtain certain services from the Service Company with the cost of hiring IAWC personnel to perform these services. The compared services included corporate governance, customer service and employee benefits center. IAWC stated that these services could not be outsourced to nonaffiliate providers because of the need to ensure accountability and to protect the confidentiality of certain information. The study showed a savings of $1.7 million by allowing the Service Company to share the cost of these functions with other American Water operating companies.

¶ 67       The third study, the Belleville lab study, compared the Service Company's projected per-test laboratory cost at its laboratory in Belleville, Illinois, to the expected market per-test cost for the test year based on competitive price information from three outside water testing labs. The study concluded that IAWC would save $207,253 by having water tested at the Service Company's Belleville lab.

¶ 68       In its order, the Commission found:

"On this issue, the Commission finds that the studies performed by IAWC do not represent a reasonable effort to comply with the directive of the Commission. The Commission clearly stated in its order in Docket 07-0507 that IAWC's Service Company costs were questionable and that IAWC was to perform a study that compared the Service Company's costs to the costs that would be obtained through competitive bidding.

\* \* \*

However, IAWC did not provide the information as specified [in the quoted portion of Docket No. 07-0507] in this rate filing. With no basis for comparison of the lower cost or market for these services, the Commission cannot adequately determine whether the increases in management fees proposed in this case by IAWC are just and reasonable. Thus, the Commission agrees with the [Attorney General's] position on this issue and concludes that the Service Company Fees should be capped at 5% over the amount approved in the 07-0507 Order."

¶ 69       IAWC asserts that this finding by the Commission is contrary to the evidence presented on the issue and against the manifest weight of the evidence. IAWC contends that no witness on behalf of the Commission staff or an intervenor disputed IAWC's cost comparison

-18-

testimony or contested the methodologies, conclusions or forecast data of the studies. Further, no evidence was presented to counter IAWC's findings that the Service Company provided services at a lower cost. Moreover, IAWC maintains that it complied with the directives of the Docket No. 07-0507 order by submitting the cost study, the self-provision study and Belleville lab study.

¶ 70 The Attorney General argued before the Commission and argues now on appeal that IAWC failed to demonstrate how the Service Company employees were replacing IAWC employees or performing work otherwise performed by IAWC employees. The Attorney General noted that in the current rate case, IAWC showed an increase in direct employees as well as the increase in costs for the Service Company. The Attorney General further pointed out that the increase in Service Company fees is significantly higher than the increases and decreases in prior years. Specifically, it referred to IAWC's projected cost to increase 9.5% from 2009 to 2010, which later increased to 12.1%, but the increase from December 2007 to December 2009 was only 4.37%. Additionally, the villages of Homer Glen and Bolingbrook took issue with IAWC's requested Service Company fees and assert on appeal that the Commission's findings should be upheld because IAWC failed to meet its burden of proof.

¶ 71 Despite IAWC's argument that there was no testimony challenging its compliance with the mandate set forth in Docket 07-0507, the Attorney General and other intervenors clearly argued that IAWC failed to establish that it was entitled to the requested 22.5% increase in Service Company fees. The Commission ordered IAWC to conduct a study comparing the cost of the services provided by the Service Company to the cost of obtaining the services through competitive bidding on the open market. The Commission then concluded that IAWC's cost study did not comply with this request.

¶ 72 In *Commonwealth Edison*, ComEd requested compensation for salaried employees who supported delivery services, but some of these employees also worked on a merger, which did not relate to providing electric utility service and should not be charged to customers. The Commission reduced the requested amount by 25% as merger-related costs and did not explain in detail how it chose that deduction. *Commonwealth Edison*, 405 Ill. App. 3d at 399-400. On appeal, the reviewing court found the Commission's findings to be adequate because "they are specific enough to enable this court to make an informed and intelligent review of its order. See 220 ILCS 5/10-201(e)(iii) (West 2006)." *Commonwealth Edison*, 405 Ill. App. 3d at 400. The court noted that the Commission heard substantial testimony to exclude a portion of the challenged labor costs and concluded that under the deferential standard of review, they were compelled to affirm the Commission's finding, even if the court might have determined a different percentage. *Commonwealth Edison*, 405 Ill. App. 3d at 402.

¶ 73 Similarly, in the present case, the Commission heard substantial evidence regarding the Service Company fees. Several parties argued against the increase. The Commission was in the best position to assess whether the studies performed by IAWC complied with its directive. The Commission concluded that the studies were not in compliance and it did not have sufficient evidence to justify the requested increase. As the reviewing court found in *Commonwealth Edison*, the Commission's decision is entitled to deference. Accordingly, we affirm the Commission's finding regarding the Service Company fees.

¶ 74       Finally, IAWC contends that the Commission's decision was rendered in a manner contrary to law and to the prejudice of IAWC. Specifically, IAWC argues that the Commission's order stated that it " 'considered' public comments in 'reaching its decision,' " but the Commission can only rely on record evidence in making its decisions. See 220 ILCS 5/10-103 (West 2010). While IAWC acknowledges that the legislature and the Commission values public comment (see 220 ILCS 5/2-107, 8-306(n) (West 2010)), IAWC contends that the public comments do not constitute evidence. However, IAWC fails to point to any specific public comments that impacted the Commission's decision regarding the service company fees nor any indication in the Commission's decision that it treated the public comments as evidence. IAWC's argument is speculation and lacks any foundation in the record.

¶ 75       Further, we point out that IAWC highlighted only a portion of the Commission's order noting the public comments. The Commission stated:

> "The Commission also wishes to emphasize that it appreciates the many comments provided in the public forums and on the e-Docket system, as well as the time and effort expended by those who prepared and provided them. These comments have been considered by the Commission in reaching its decisions in this Order, to the extent permitted by law. The Commission notes that many of the adjustments proposed by Staff, [the Attorney General] and other Intervenors have been adopted in this Order, thereby reducing the revenue increase proposed by IAWC."

¶ 76       Nothing in these statements by the Commission indicates the improper use of public comments as evidence. Rather, the Commission specifically stated that the public comments were only considered "to the extent permitted by law." IAWC has failed to establish that the Commission considered the public comments beyond what is permitted by law. Accordingly, we find this contention by IAWC to be without merit.

¶ 77       Based on the foregoing, we affirm the Commission's order regarding the prior rate case expense and the Service Company fees, but we remand the cause for the Commission to further consider the amount of the legal and expert fees awarded pursuant to section 9-229.

¶ 78       Affirmed in part and remanded in part.